MOORE CONSTRUCTION CO., INC.,
Plaintiff/Appellant,

v.

CLARKSVILLE DEPARTMENT OF
ELECTRICITY, Kennon Construction
Company, and Cincinnati Insurance
Company, Defendants/Appellees.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Feb. 26, 1985.

Affirmed by Supreme Court
March 24, 1986.

**2**

Robert Clive Marks, Albert P. Marks, Marks, Marks, & Shell, Clarksville, for plaintiff/appellant.

A. Scott Derrick, Dodson, Harris, Robinson & Aden, Nashville, for defendants/appellees.

OPINION

KOCH, Judge.

This case involves a contractor's claim for delay damages arising out of the construction of the Clarksville Department of Electricity's new office building and warehouse. Moore Construction Company filed this action in the Law and Equity Court for Montgomery County based alternatively on contract and quasi-contract theories against the Clarksville Department of Electricity, the Kennon Construction Company (a co-prime contractor), and the Cincinnati Insurance Company (Kennon's bonding company). Following a trial without a jury, the trial court entered a judgment on January 9, 1984, wherein it awarded Moore Construction Company $2,719.75 in damages against the Clarksville Department of Electricity and dismissed its actions against the Kennon Construction Company and the Cincinnati Insurance Company. Moore Construction Company has duly perfected this appeal. For the reasons stated herein, we modify the judgment of the trial court.

I.

*The Facts*

In 1980, the Clarksville Department of Electricity [hereinafter referred to as the "Department"] embarked upon a project to construct a new office building and general warehouse on Highway 79–N in the St. Bethlehem community of Clarksville. The Department proceeded to retain two separate design firms to develop plans for the project. On November 20, 1980, it hired Clarksville Engineering Services, Inc. [hereinafter referred to as "Clarksville Engineering"] to prepare the plans and specifications for the site preparation and other exterior work. It also retained Rufus Johnson and Associates to design the office building and warehouse.

Once both sets of plans were completed, the Department decided to proceed by hiring two different prime contractors, one to perform the site preparation and other exterior work and the other to construct the office building and warehouse. On March 17, 1981, it entered into a standard form contract[1] in the amount of $469,747.55 with the Moore Construction Company of Clarksville [hereinafter referred to as "Moore"] to perform the site preparation and other exterior work. The Department gave Moore its notice to proceed immediately because a portion of the site preparation work was required to be completed before the other prime contractor could begin constructing the office building and warehouse. Moore began to work as soon as it received the notice to proceed.

On May 29, 1981, the Department entered into a second standard form contract[2] in the amount of $1,132,477 with the Kennon Construction Company of Nashville [hereinafter referred to as "Kennon"] to construct the office building and general warehouse. Following the accepted practice of the construction industry and pursuant to Tenn.Code Ann. § 12–4–201 *et seq.*, Kennon furnished the Department with a standard form performance bond and a standard form labor and material payment

---

1. The Department selected as its contract the Standard Form of Agreement Between Owner and Contractor, 1977 Edition (AIA Document A101). This contract incorporated the General Conditions of the Contract for Construction, 1976 Edition (AIA Document A201). The other contract documents were not introduced into evidence.

2. The Department used the same standard form documents for its contract with Kennon that it used for its agreement with Moore. Only the Agreement and General Conditions were included in this record.

bond[3] each issued by the Cincinnati Insurance Company [hereinafter referred to by name or as the "bonding company"] to assure Kennon's complete and satisfactory performance of its contractual obligations to the Department.

Following the execution of Kennon's contract, all parties, including the Department, both general contractors, and both design firms, held a preconstruction conference at the job site to discuss the sequence of the work. In general terms, they agreed upon the work Moore would complete before Kennon started its work and upon the manner in which the two contractors would coordinate their work. After this meeting, all parties understood that Moore would be able to complete only part of its work before Kennon started construction and that Moore would be able to complete the remainder of its work only after Kennon had constructed most of the office building and warehouse. The parties also agreed upon the areas at the job site where Kennon and its subcontractors would store their equipment and materials in order to avoid interfering with the work that Moore was doing. Based upon this meeting and the terms of its contract,[4] Moore expected that its work would be substantially complete on October 26, 1981.

The Department gave Kennon its notice to proceed on June 22, 1981. Kennon began to work soon thereafter; however, its work began to bog down several months later when it experienced problems on the job. These problems were not due to the manner in which Moore was performing its work but rather were caused by the defective work of Kennon's masonry subcontractor and by the installation of a defective roof on the warehouse portion of the project. The delay caused by these problems as well as delays caused by the weather put Kennon substantially behind schedule, and, therefore, it was unable to complete enough of its work to permit Moore to finish the remainder of its work within the time allowed by Moore's contract with the Department.

Beginning in September, 1981, Moore began to make a series of complaints that it could not complete its work because of Kennon's delay in performing its work and because Kennon and its subcontractors were not using the areas designated for storage of materials and equipment but rather were storing their equipment and materials adjacent to the building. This, coupled with the construction trash being strewn in the construction area, prevented Moore from completing its work.

As a result of Moore's concerns, the parties conducted a meeting on the job site on September 14, 1981, to discuss a revised schedule for completing the work. As a result of this meeting, the parties agreed to adjust the schedule to allow for the delays they had already experienced. While no written change order altering the time for performance[5] appears to have been prepared, the project manager prepared a memorandum of this meeting on September 15, 1981, stating that the parties had agreed to extend Moore's time to complete the paving portion of its work until the end of November, 1981.

Kennon continued to experience delays caused by its own subcontractors following this meeting, and Moore continued to be prevented from completing its work even in accordance with the revised schedule. At Moore's request, another meeting was held at the job site on December 15, 1981, to discuss this problem. At that meeting, like other meetings, Kennon assured Moore

---

**3.** Both the Performance Bond and the Labor Material Payment Bond, dated May 29, 1981, were prepared on the standard AIA Document A311 (February, 1970 Ed.) and were made payable to the Department as obligee.

**4.** Moore's contract with the Department provided that substantial completion of its work "shall be achieved not later than two hundred ten (210) consecutive calendar days from and in-

cluding start date as set forth in Notice to Proceed".

**5.** Article 8.3.1 of the General Conditions of Moore's contract requires that extensions of time required by delay that are the owner's responsibility shall be made using the change order procedure in Article 12.1.

that the project would be ready for them to return to work "within a few days." It was not.

During the period of delay commencing approximately in September, 1981, when Moore was unable to work, it was required to maintain certain of its supervisory employees on the project on a part-time basis to make sure that the work it had already done was protected. On several occasions, Moore moved its workers back onto the project based upon Kennon's assurances that it could begin work only to find that it could not proceed. Because of Kennon's repeated assurances that it would be able to begin work again in short order and in order to be able to resume its work on short notice, Moore was also required to leave certain pieces of equipment at the job site and was prevented from moving them to other job sites where they could be used while Kennon was completing its work.

Finally, in the Spring of 1982, Clarksville Engineering,[6] on behalf of the Department, instructed Moore to go back to work and also directed it to perform certain extra work consisting of cleaning up and removing trash that Kennon had refused to remove.[7] This was necessary before Moore could complete its work, and Moore performed this extra work with all the parties' knowledge and without the preparation of a formal change order. With regard to payment for this extra work, Moore's president testified:

> And this is the bill that we kept up with under instructions from Vic Al-

bright [the owner of Clarksville Engineering] with the Department of Electricity to keep up with our time and go on and get the job done.

Moore completed this extra work as well as the other work it was required to perform in July, 1982.[8]

Following the completion of its work, Moore prepared its final monthly estimate of work completed covering the period through August 31, 1982 [hereinafter referred to as "Estimate No. 10"]. While a portion of this estimate dealt with work completed pursuant to the contract, it also contained Moore's request for the payment of $21,991.25 which represented the cost of the extra work it was requested to do as well as the increased costs it had incurred as a result of Kennon's delays.[9] Clarksville Engineering approved Estimate No. 10 for payment in its entirety.[10]

Moore, by letter dated September 29, 1982, transmitted this estimate to the Department. The letter said, in part:

> We were delayed as you know by the contractors you employed to construct the building. Because they did not meet the proposed building schedule, we were delayed approximately ten months.
>
> As we had no control of the building contractor or his work and our contract is with the Department of Electricity, it is therefore necessary for us to make this request for payment of you.

The Department received this request for payment and prepared its response which

---

6. At the time that Clarksville Engineering was employed by the Department to serve as project engineer for the site preparation work, it was also employed by Moore to assist in the "line and grade work." Its duties with Moore did not relate directly to matters that form the basis of this action.

7. Article 12.1 of the General Conditions of Moore's contract with the Department requires that changes in the scope of the work must be accomplished through the use of a formal change order. The Department was aware of and concurred in Moore doing this extra work; however, it did not insist upon the preparation of a change order.

8. This extra work consisted of three items: (1) grading and removing excess excavation and

debris left by Kennon, (2) repairing a roof drain line damaged by Kennon, and (3) replacing curbing broken by Kennon.

9. This amount consisted of $2,813.32 in "Extra work & Cost billed Kennon—not paid;" $923.60 for "Increase in Fence;" and $18,254.33 for "Overhead, Ins., Bond Cost—Due to delay of Work."

10. Clarksville Engineering was required by Section 1.6.5 of its contract with the Department as well as by Article 9.4.1 of the General Conditions to review applications for payment and to make recommendations to the Department. Its approval is not binding upon the Department.

was contained in a letter to Moore dated September 29, 1982. This letter, in part, stated:

> After having let our attorney review both the estimate for billing and your contract with the CDE, we are backing out of estimate No. 10, the items listed below, and giving you the status of each.
>
> Item No. 1. ($2,813.22) Those amounts billed to Kennon Construction Co.—We will see that either Kennon Construction Company pay this amount to you, or we will pay the amount and withhold the funds from Kennon.
>
> Item No. 2. ($923.60) Increase in the fence.—This is a contract between you and your supplier. What you are willing to pay for the fence is between you and the fence supplier.
>
> Item No. 3. ($18,254.33) The amount billed as increase to contract by your company.—This amount is denied because we do not see by contract where you have the right to increase the contract amount.

The Department's general manager who wrote this letter testified that the Department "backed out" all the charges the Department was not aware of prior to receiving Estimate No. 10.

The Department also requested that Moore provide additional information concerning its delay damage claim. Thus, on October 8, 1982, Paul W. Moore sent another letter to the Department along with a two page analysis of the manner in which Moore had calculated its delay damage claim. This analysis indicated that Moore had incurred increased costs in the amount of $25,240.23 [11] because of Kennon's delays in completing its portion of the work in a timely manner. These damages included:

| | | |
|---|---|---|
| 1. | Increase in the cost of the fence requested by the subcontractor | $ 923.60 |
| 2. | Overhead, insurance and bonding | 5,118.25 |
| 3. | Supervisory and Central Office Labor | 11,373.89 |
| 4. | Loss of use of equipment | 3,560.40 |
| 5. | Loss of Interest on retainage | 1,795.23 |
| 6. | Loss of Interest on anticipated income | 2,468.86 |
| | TOTAL | $25,240.23 |

Moore subsequently received full payment for the work performed pursuant to the contract, including the retainage, except for the extra work that the Department looked to Kennon to pay and the $25,240.23 in damages caused by Kennon's delay.

Moore filed its complaint on May 18, 1983, against the Department, Kennon, and Kennon's bonding company. It was based upon the following theories: (1) that the Department had breached its contract with Moore; (2) that the Department had been unjustly enriched by the work Moore had done but for which it had not been paid; and (3) that Moore was a third-party beneficiary of the contract between the Department and Kennon and also of the contract between the Department and Kennon's bonding company.[12]

The trial court heard proof on November 1, 1983, and rendered its opinion on December 14, 1983, wherein it found that: (1) Moore was not entitled to receive damages resulting from Kennon's delay because it had not obtained a written change order as required by the contract and because its alleged damages were not expenses directly relating to the work Moore performed for the Department; (2) Moore was not a third party beneficiary of the Department's contract with Kennon or the contract between the Department and Kennon's bonding company; and (3) Moore was entitled to receive the cost of the extra work it was required to perform because Kennon had damaged parts of the work already done

---

11. No explanation has been given for the discrepancy between this amount and the amount requested in Estimate No. 10.

12. The Department filed a cross-claim against Kennon on July 14, 1983. Later, on November 1, 1983, the day of the trial, it took a voluntary nonsuit with regard to this cross-claim. The Department's original counsel also withdrew at this time, and thus, at trial and on this appeal, the Department and Kennon are represented by the same attorney. Article 6.2.5 of Kennon's contract with the Department requires Kennon to defend this action at the Department's expense and to reimburse the Department for any judgment rendered against it as well as court costs and attorneys fees.

even though no change order had been prepared for this work. Thereafter, on January 9, 1984, the trial court entered a judgment in the amount of $2,719.75 [13] in favor of Moore and against the Department.

## II.

*Moore's Third Party Beneficiary Claims*

Moore's causes of action against Kennon and its bonding company, Cincinnati Insurance Company, are based upon the theory that it was the third party beneficiary of the contract between Kennon and the Department and of the performance and labor and material payment bonds issued by the bonding company. The trial court dismissed these claims after determining that these contracts "ran solely for the benefit" of the Department.

Claims based upon a third party beneficiary theory have proven to be difficult ones for courts to entertain because the ideas behind the theory are obscure and elusive. 4 A. Corbin, *Corbin on Contracts* § 776, at 14–15 (1951). As a result, the decisions are inconsistent and in apparent conflict. See 17 Am.Jur.2d *Contracts* § 302 n. 12 (1964); 17A C.J.S. *Contracts* § 519(4)a n. 16 (1963); and 2 S. Williston, *A Treatise on the Law of Contracts* § 347 (3d ed.1959). More than fifty years ago, commenting favorably upon the adoption of the Restatement of Contracts' rules regarding contract beneficiaries, Professor Corbin noted:

> These rules represent the presently existing American law; but it has been arrived at only after more than a century of litigation, with an immense amount of conflict in decision and in the forms in which the law has been stated by the courts. These conflicting decisions and statements fill our reports and are still

cited indiscriminately as authority, thus propagating further litigation and conflict. A. Corbin, *Third Parties as Beneficiaries of Contractors' Surety Bonds,* 38 Yale L.J. 1 (1928).

Because of the complexity of the theory and the conflict among the decisions, most commentators have been critical of the tests that have been devised to determine whether a third party should be permitted to enforce a contract made for his benefit to which he was not a party. See 2 S. Williston, *A Treatise on the Law of Contracts* § 356A (3d ed. 1959) and 4 A. Corbin, *Corbin on Contracts* § 776 (1951).

The application of the third party beneficiary theory to construction contracts has been particularly troublesome. This is because of the number of different parties that are routinely involved in a project's construction,[14] the complex interrelationships of the professional disciplines involved, the amount of money at stake, and each party's mutual interdependence on the performance of the other. Commenting upon the synergism of a construction project, the Court of Appeals of New York has noted:

> Difficulty may be encountered, however, in applying the intent to benefit test in construction contracts because of the multiple contractual relationships involved and because performance ultimately, if indirectly, runs to each party of the several contracts. Hence, interpretational difficulties prevalent in third-party beneficiary contracts are compounded as a result of the peculiar problems presented by construction contracts. *Port Chester Electrical Construction Corp. v. Atlas,* 40 N.E.2d 652, 655–56, 357 N.E.2d 983, 986, 389 N.Y.S.2d 327, 330 (1976).

The law regarding third party beneficiaries has developed in Tennessee no less

---

13. This award consists of the claimed cost of the extra work performed by Moore (see footnote no. 8, *supra*) plus 15% for overhead and profit.

14. Professor Corbin has noted "Whenever a contract involves three or more parties instead of two, their legal relations increase by geometri-

cal progression. This is the chief reason for the complexity, conflict and uncertainty in the law of suretyship and in the law of third party beneficiaries." A. Corbin, *Third Parties as Beneficiaries of Contractors' Surety Bonds,* 38 Yale L.J. 1, 2 (1928).

tortuously than it has developed in other states. While it was recognized early in our jurisprudence that a party for whose benefit a contract is made could enforce the contract independently, *McCarty v. Blevins*, 13 Tenn. (5 Yerg.) 195 (1833), it was not until 1967 that the Tennessee Supreme Court announced the test to be used to determine whether a person claiming to be a third party beneficiary should be permitted to enforce a contract. The Court, adopting the formulation in 1 Restatement of Contracts § 133 (1932), held:

> In contracts there are essentially three types of third party beneficiaries. First, where the performance of the promise will constitute a gift to the beneficiary; the beneficiary is a donee beneficiary. Second, if no purpose to make a gift appears from the terms of the contract and the performance of it will satisfy an actual or supposed asserted duty of the promisee to the beneficiary; the beneficiary is a creditor beneficiary. Third, in all other cases the beneficiary is deemed to be an incidental beneficiary. *Willard v. Claborn*, 220 Tenn. 501, 505–06, 419 S.W.2d 168, 170 (1967).

See also 2 S. Williston, *A Treatise on the Law of Contracts* § 356, at 826–27 (3d ed. 1959) and 4 A. Corbin, *Corbin on Contracts* §§ 774 & 779C (1951).

Under this formulation, our courts have determined that donee and creditor beneficiaries have the independent right to enforce contracts made by others for their benefit; however, incidental beneficiaries do not have a similar right. *Willard v. Claborn*, 220 Tenn. 501, 506, 419 S.W.2d 168, 170 (1967); *Stewart v. Sullivan County*, 196 Tenn. 49, 55, 264 S.W.2d 217, 219 (1953); and *Air Temperature, Inc. v. Morris*, 63 Tenn.App. 90, 100–02, 469 S.W.2d 495, 500–01 (1970).[15]

Thus, Tennessee courts have generally attempted to decide whether a party can maintain an action based upon a third party beneficiary theory using a process of elimi-

nation. This process, however, has not been uniformly acceptable, and there have been a number of cases where this rationale has been ignored in order to enable the court to permit a person to maintain an action as a third party beneficiary. In *Western Union Telegraph Co. v. Potts*, 120 Tenn. 37, 113 S.W. 789 (1908), the Tennessee Supreme Court held that an undisclosed beneficiary of a telegram who was not either the sender or recipient could maintain an independent action against the telegraph company. Such a party does not fit neatly into either the donee or creditor beneficiary category. Later, in 1935, the Court permitted the husband of a woman killed after being struck by an automobile to maintain an action as a third party beneficiary against the insurance company of the owner of the automobile. *Associated Indemnity Corp. of San Francisco v. McAlexander*, 168 Tenn. 424, 443, 79 S.W.2d 556, 563 (1935). It is difficult to characterize Mr. McAlexander as either a donee or creditor beneficiary of the contract of insurance.

Shortly after the Tennessee Supreme Court announced its decision in *Willard v. Claborn*, the same Justice who wrote the *Willard v. Claborn* decision issued another opinion applying the third party beneficiary theory. In a case involving the sale of $2,500,000 of industrial development revenue bonds by Giles County, the private company that had entered into a lease agreement with the county to occupy the building constructed with these bonds was permitted to maintain an action as third party beneficiary against the county's fiscal agent based upon the agent's alleged wrongful retention of a portion of the proceeds from the sale of the bonds. Stressing the business' statutory interest in the disposition of the proceeds from the sale of the bonds, the Court found that the company was a third party beneficiary to the contract between Giles County and its fiscal agent without once referring to the test

---

**15.** See also 2 S. Williston, *A Treatise on the Law of Contracts* §§ 402 & 403 (3d ed. 1959) and 4 A. Corbin, *Corbin on Contracts* § 779C (1951).

it had adopted approximately two years earlier in *Willard v. Claborn.* Rather, the majority of the Court held:

> Hence, the Court requires that all persons interested, either legally or beneficially, in the subject matter shall be made parties to it, either as complainants or as defendants, so that there may be a decree that will bind them all. By this means, the court is enabled to make a complete decree between all the parties interested in the controversy, and thus not only to prevent future litigation by taking away the necessity of a multiplicity of suits, but to make it perfectly certain that no injustice has been done to any party interested in the subject matter of the suit. *County of Giles v. First U.S. Corp.,* 223 Tenn. 345, 353–54, 445 S.W.2d 157, 160–61 (1969).

Jack's Cookie Corp., the private company in this case, was neither a donee beneficiary nor a creditor beneficiary, and there was no showing that the county and its fiscal agent intended to benefit the company when they entered into their contract to sell the bonds.[16]

The approach employed by the Tennessee Supreme Court in the *County of Giles v. First U.S. Corp.* case appears to implicitly recognize Professor Corbin's admonition that the motives or purposes of the contracting parties should not control when analyzing a third party beneficiary claim. Rather, Professor Corbin asserted that a third party beneficiary's action should be permitted if it advances the result intended by the contracting parties when they entered the contract. 4 A. Corbin, *Corbin on Contracts* § 776, at 18 (1951).[17]

■ The American Law Institute has modified the Restatement's formulation of the rules relating to contract beneficiaries since the Tennessee Supreme Court last had occasion to consider a third party beneficiary cause of action. In 1979, the three categories of beneficiaries contained in the original Restatement were replaced with two categories. Thus, while the category of "incidental beneficiary" remained, the categories of "donee beneficiary" and "creditor beneficiary" were combined into a new "intended beneficiary" category.[18] Under this approach, if recognition of a third party beneficiary's rights is "appropriate to effectuate the intention of the parties" and if there is either an expression in the contract that the contracting parties intended to benefit the third party (the "intent to benefit" test) or proof that the promisor's performance will otherwise discharge a duty owed to a third party beneficiary by the promisee (the "duty owed" test), then the third party beneficiary can maintain an action on the contract.[19]

■ Since the law presumes that a contract has been executed for the benefit of the parties thereto, a person claiming to be an intended beneficiary has the burden of proving from the terms of the contract itself or the circumstances surrounding the

---

16. This decision prompted one law review commentator to conclude that the Tennessee Supreme Court had departed from the rigid "intent to benefit" test in favor of a test which determines whether a third party's rights or obligations were "directly affected" adversely by another party's breach of his contract. Comment, *Contracts for the Benefit of Third Parties in the Construction Industry,* 40 Fordham L.Rev. 315, 333–334 (1971).

17. In its latest reported case on the subject, the Tennessee Supreme Court returned to the "intent to benefit" test adopted in the *Willard v. Claborn* case. *McCall v. Towne Square, Inc.,* 503 S.W.2d 180, 184 (Tenn.1973).

18. Restatement (Second) of Contracts § 302 (1979) provides:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

19. *Cretex Companies, Inc. v. Construction Leaders, Inc.,* 342 N.W.2d 135, 139 (Minn.1984).

contract's execution that he is entitled to recover. *Rutherford County v. City of Murfreesboro*, 202 Tenn. 455, 459–60, 304 S.W.2d 635, 637 (1957), and *Sherrill v. Erwin*, 31 Tenn.App. 663, 673, 220 S.W.2d 878, 882 (1949). Each case must be decided on its own unique facts considered in light of the specific contractual agreements and the circumstances under which they were made.

## A.

### The Contract Between the Department and Kennon

The issue presented by Moore's claim that it was an intended beneficiary of the contract between Kennon and the Department is whether an independent prime contractor can be an intended or third party beneficiary of a construction contract between the owner and another prime contractor for work being performed as part of the same construction project. The courts that have addressed this issue have reached different results [20] primarily because of the differences in the contract language and the disparity in the rationale used by the courts.

The New Jersey Supreme Court upheld the right of two of the nine contractors working on the construction of the Rutgers Medical School to assert that they were third party or intended beneficiaries of the contract between the university and the general prime contractor. The Court held:

> Thus the parties conceived that the prime contractors would benefit from proper performance by their peers. The project could not have been finished without each contractor meeting its respective obligations. It is reasonable to conclude

that the obligations of the others induced each contractor to undertake its job at the agreed price. *Broadway Maintenance Corp. v. Rutgers*, 90 N.J. 253, 447 A.2d 906, 910 (1982).

See also *M.T. Reed Construction Co. v. Virginia Metal Products Corp.*, 213 F.2d 337, 338 (5th Cir.1954).

These cases as well as the others granting relief based upon a third party beneficiary claim point to an emerging trend. Unless the construction contracts involved clearly provide otherwise, prime contractors on construction projects involving multiple prime contractors will be considered to be intended or third party beneficiaries of the contracts between the project's owner and other prime contractors. They have been permitted to recover when the courts have found that their fellow prime contractor assumed an obligation of the owner to them (the "duty owed" test) or that their fellow contractor assumed an independent duty to them in their own contract with the owner (the "intent to benefit" test). The courts have generally relied upon the following factors to support a prime contractor's third party claim: (1) the construction contracts contain substantially the same language; (2) all contracts provide that time is of the essence; (3) all contracts provide for prompt performance and completion; (4) each contract recognizes other contractors' rights to performance; (5) each contract contains a non-interference provision; and (6) each contract obligates the prime contractor to pay for the damage it may cause to the work, materials, or equipment of other contractors working on the project.

The contracts used in this case meet all these requirements. With the exception

---

20. *M.T. Reed Construction Co. v. Virginia Metal Products Corp.*, 213 F.2d 337 (5th Cir.1954) [claim upheld]; *Broadway Maintenance Corp. v. Rutgers*, 90 N.J. 253, 447 A.2d 906 (1982) [claim upheld]; *Visintine & Co. v. New York, Chicago, and St. Louis R. Co.*, 169 Ohio St. 505, 160 N.E.2d 311 (1959) [claim upheld]; *J. Louis Crum Corp. v. Alfred Lindgren, Inc.*, 564 S.W.2d 544 (Mo.App.1978) [claim upheld]; and *KEC Corp. v. New York State Environmental Facilities Corp.*, 76 Misc.2d 170, 350 N.Y.S.2d 331 (1973) [claim upheld]. But see *Port Chester Electrical Construction Corp. v. Atlas*, 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E. 983 (1976) [recovery allowed but third party beneficiary theory disapproved]; *Buchman Plumbing Co. v. Regents of the University of Minnesota*, 298 Minn. 328, 215 N.W.2d 479 (1974) [claim denied]; and *Snyder Plumbing & Heating Corp. v. Purcell*, 9 A.D.2d 505, 195 N.Y.S.2d 780 (1960) [claim denied on narrow grounds].

of the description of the work and the contract amount, the contracts between Kennon and the Department and between Moore and the Department are virtually identical. They both are embodied in standard American Institute of Architects contract documents including the General Conditions of the Contract for Construction, 1976 Edition (AIA Document A201). These general conditions specifically recognize that one contractor's work may be only part of the entire project[21] and that other prime contractors may also be performing work on the same project.[22] These general conditions explicitly state that time is of the essence of the contract,[23] that each contractor's work should be promptly performed and completed,[24] and that all contractors on the project have the right to perform their work free from interference.[25] The general conditions also obligate a contractor to pay for the damages it may cause to the work of other contractors working on the same project.[26]

Based upon our review of the contracts involved in this project, we have determined that Moore was an intended or third party beneficiary of the contract between Kennon and the Department. In its contract with the Department, Kennon specifically agreed to confer a benefit upon Moore or any other prime contractor working on the project by agreeing to do its work so as not to interfere with their work and by agreeing to be responsible for and to remedy any damages caused to others' work. Kennon also agreed to undertake the Department's responsibility to Moore to make sure that the work was coordinated.

This interpretation of the contract documents is complemented by the parties' conduct on the job. After the Department signed its contract with Kennon, all the parties had a preconstruction conference to make sure the work was coordinated so that both contractors could perform in a timely manner. Several other similar meetings were also conducted prior to the substantial completion of the project. Finally, in its letter of September 29, 1982, the Department specifically relied upon Kennon's obligation in Articles 6.2.3, 6.2.4, and 10.2.5 to remedy and pay for any damages it may cause to other contractors working on the project by informing Moore that it was looking to Kennon to pay Moore directly for the extra work Moore was required to do because of Kennon's failure to perform.[27]

B.

*The Bonds Issued by Cincinnati Insurance Company*

■ Moore also claims that it was an intended or third party beneficiary of the performance and labor and material payment bonds issued by Cincinnati Insurance Company. Based upon the language of these bonds and the statutes requiring their issuance, we concur with the trial court's determination that Moore could not maintain a third party action directly against Kennon's bonding company because the language of the bonds themselves makes it clear that they were not issued to benefit Moore or to fulfill an obligation the Department had to Moore.

The standard form performance bond issued by Kennon's bonding company specifically provides:

"No right of action shall accrue on this bond to or for the use of any person or corporation other than the Owner named

21. See Articles 1.1.3 and 1.1.4 of the General Conditions, 1976 Edition, AIA Document A201 [hereinafter referred to as the "General Conditions"].

22. See General Conditions Article 6.1.1.

23. See General Conditions Article 8.2.1.

24. See General Conditions Articles 3.2.4, 4.10.1, and 8.2.2.

25. See General Conditions Articles 6.2.1, 6.2.2, 4.13.1, and 4.14.2.

26. See General Conditions Articles 6.2.3, 6.2.4, and 10.2.5.

27. See footnote no. 8., *supra.*

herein or the heirs, executors, administrators or successors of the Owner." It also conditions the surety's liability under this bond to situations where the owner has declared the contractor to be in default. Since Kennon has never been declared to be in default by the Department and since Moore is not named as the "Owner" on this bond, it has no cause of action under the performance bond.

The surety's labor and material payment bond is also a standard form bond issued in accordance with Tenn.Code Ann. § 12–4–201 *et seq.* which requires that contractors on all public construction projects provide a bond insuring the payment of all laborers, material suppliers, and subcontractors. These bonds are intended to inure to the benefit of suppliers, materialmen, and subcontractors. The bond issued on this project specifically provides that it is "for the use and benefit of [the] claimants as hereinbelow defined." A claimant is defined as

> [O]ne having a direct contract with the Principal [Kennon] or with a Subcontractor of the Principal for labor, material, or both, used or reasonably required for use in the performance of the Contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service, or rental of equipment directly applicable to the Contract.

By incorporating this definition of "claimant," it is clear that neither the Department, nor Kennon, nor the Cincinnati Insurance Company intended to confer any benefit on other prime contractors working on this project. See *National Surety Corp. v. Fischer Steel Corp.*, 213 Tenn. 396, 401, 374 S.W.2d 372, 375 (1964); *Continental Bronze Co. v. Salvo & Armstrong Steel Co.*, 8 Mass.App. 799, 397 N.E.2d 1143, 1144 (1979); and *Ceco Corp.*

*v. Plaza Point, Inc.*, 573 S.W.2d 92, 94 (Mo.App.1978). Further, in light of the statutory framework under which this bond was issued, it is evident that this bond was not required for the purpose of aiding the Department in discharging an obligation to Moore or any other independent prime contractor performing work on the project. Thus, we conclude, as did the trial court, that Moore was not a third party beneficiary of the labor and material payment bond.

### III.

*Moore's Compliance with the Written Change Order Requirement*

There is no dispute that the completion of Moore's work was delayed through no fault of its own. The trial court, however, determined that the company was not entitled to recover damages from the parties responsible for the delay because it had failed to prepare and submit a written change order in the manner required by its contract with the Department.[28]

█ Including a written change order requirement in a construction contract is not uncommon. It promotes a more definite understanding between the parties and thus, helps to avoid potential controversies. *Bannon v. Jackson*, 121 Tenn. 381, 391, 117 S.W. 504, 506 (1908). It benefits the owner primarily because it provides formal notice that a claim is being made thereby giving the owner an opportunity to take appropriate corrective action or to prepare a proper response to the claims. In Tennessee, as in a majority of jurisdictions, these provisions are valid and binding. *W & O Construction Co. v. City of Smithville*, 557 S.W.2d 920, 922 (Tenn.1977). However, like other contractual provisions, they can be waived or abrogated by the parties.[29]

---

**28.** Article 12.3.1 of the General Conditions of Moore's contract with the Department states, in part:

> If the Contractor wishes to make a claim for an increase in the Contract Sum, he shall give the Architect written notice thereof with-

in twenty days after the occurrence of the event giving rise to such claim.

**29.** While courts have most frequently recognized the waiver theory as a basis to avoid contractual written change order requirements, see 4 S. Williston, *A Treatise on the the Law of*

The waiver of a written change order requirement by an owner is not always required to be in writing but may be the result of the parties' conduct on the job. Thus, it is not uncommon for courts to find that an owner has waived a written notice requirement in cases where extra work has been ordered verbally by the owner or the extra work has been performed with the owner's knowledge and without its objection. See Annot., 1 A.L.R.3d 1273 §§ 14 & 15 (1965).

The course of dealing between the parties can also amount to a waiver where the conduct of the parties makes it clear that they did not intend to rely strictly upon a contract's written notice requirement and that adherence to such a requirement would serve no useful purpose. *Copco Steel & Engineering Co. v. United States*, 341 F.2d 590, 598 (Ct.Cl.1965), and *Willey v. Terry & Wright of Kentucky, Inc.*, 421 S.W.2d 362, 363 (Ky.App.1967). Thus, an owner's consideration of a claim on its merits without invoking a formal written notice requirement has been held to amount to the waiver of the requirement thereby preventing the owner from asserting this claim at a later time. *Blount Brothers Corp. v. United States*, 424 F.2d 1074, 1076 (Ct.Cl.1970); *Morrison-Knudsen Co. v. United States*, 397 F.2d 826, 848 (Ct.Cl. 1968). Once a party has waived the requirement with regard to a particular matter, it cannot revoke its waiver, in whole or in part, at its convenience. *Copco Steel & Engineering Co. v. United States*, 341 F.2d 590, 599 (Ct.Cl.1965).

■ The record before us demonstrates that both the Department and Kennon, by their conduct on the job with specific reference to the delays in completion, waived their right to rely on the written change order provision found in Moore's contract with the Department.

It should be recognized at the outset that a contractor whose performance is delayed through no fault of its own has two types of relief available under the standard contract prepared by the American Institute of Architects. It first has the right to an extension of the time available for performance in accordance with Article 8.3.1. In addition to a time extension, a contractor may have the right to be compensated for the increased costs it has incurred as a result of this delay in accordance with Article 6.2. Thus, construction delays have consequences that are quickly translated into time and money, and in certain situations a contractor whose performance is delayed unreasonably is entitled to both an extension of time and damages. *Chalender v. United States*, 119 F.Supp. 186, 190 (Ct.Cl.1954); *Siefford v. Housing Authority of Humboldt*, 192 Neb. 643, 223 N.W.2d 816, 820 (1974); *Forest Electric Corp. v. State*, 30 A.D.2d 905, 292 N.Y.S.2d 589, 590 (1968); and *Kenworthy v. State of California*, 236 Cal.App.2d 378, 383, 46 Cal.Rptr. 396, 400 (1965). This is such a case because the Department and Kennon, by their conduct, abrogated the formal written notice requirement in the contract with regard to the consequences of their delaying the completion of Moore's work.

There is no question that all parties knew that Moore was being prevented from completing its work because of construction delays being experienced by Kennon. As early as September, 1981, the Department recognized that these delays were not Moore's fault and extended the time of the company's performance. It did so through a job site memorandum rather than a change order even though Article 8.3.1 of the General Conditions required that a change order be prepared. It was at this point that Moore could have presumed legitimately that the Department was not going to insist on further written notice with regard to the delay because it had acknowledged that the delay had occurred and had granted the company extra time. If the Department did not require a change order to grant extra time, it should not be

Contracts § 591, at 203 (3d ed. 1961), other theories of avoidance have been recognized as well. See 13 Am.Jur.2d *Building and Construc-*

*tion Contracts* § 24 (1964); Annot., 2 A.L.R.3d 620 §§ 19 & 20 (1965); and Annot., 1 A.L.R.3d 1273 § 13[a] (1965).

permitted to require a change order for extra costs resulting from the same delay.

In the Spring of 1982, Moore was ordered not only to proceed with its work but also to perform extra work. Again, the Department did not insist that a change order be prepared as required by Article 12.1 of the General Conditions to enlarge the scope of Moore's work.

When Moore submitted its final claim for payment, the Department considered it on its merits and actually agreed to pay Moore for the extra work it had performed without a change order. It did not decline to consider the claim for extra costs Moore had incurred because of the delay. Rather, it requested additional information concerning these costs and finally denied them without clearly stating a reason for its action.

The Department's conduct commencing in September 1981 supports a conclusion that it had consciously decided that formal adherence to the written notice requirements with regard to the construction delay was no longer necessary. It had knowledge throughout the period that Moore was being delayed through no fault of its own, and it can reasonably be presumed that the Department knew that the delays could prove costly to the contractor. Finally, the Department has been unable to demonstrate how it has been prejudiced by Moore's failure to provide it with written notice of its claim sooner.

## IV.

### Contractor's Damages Resulting From Delay Attributable to the Owner

Having determined that Moore has a valid cause of action against the Department and Kennon,[30] we now turn to the question of damages. Aside from its claim for extra work, Moore's claim that it had incurred extra costs because of the delay consisted of four elements: (1) the increased cost of fencing and gates installed on the project, (2) additional supervisory and central office labor expenses, (3) the loss of use of certain items of equipment, and (4) the loss of beneficial use of the interest on its retainage and other unpaid contract funds. The trial court denied these claims by finding, with the exception of the gates and fencing, that they were not "direct costs attributable to this job." The trial court also found that Moore had failed to prove that it had been required to pay more for the fencing than it would have been required to pay originally. While we agree with the trial court that Moore has failed to prove that it has incurred increased costs for the fence, we do not agree that Moore's other increased costs cannot be considered as part of its damages resulting from the forced delay in its performance.

■ Tennessee law permits the recovery of all damages that are the normal and foreseeable result of a breach of contract. *Wilson v. Dealy*, 222 Tenn. 196, 202–03, 434 S.W.2d 835, 838 (1968), and *Bush v. Cathey*, 598 S.W.2d 777, 783 (Tenn.App. 1979). Applying this same rule in the context of a construction contract, the Virginia Supreme Court has held that

> "Direct damages" are those which arise naturally or ordinarily from a breach of contract; they are damages which, in the ordinary course of human experience, can be expected to result from a breach. *Roanoke Hospital Association v. Doyle & Russell, Inc.*, 215 Va. 796, 214 S.E.2d 155, 160 (1975).

**30.** Moore's claim is based upon the Department's breach of its contractual obligation to coordinate the work pursuant to Article 6.1.1 and 6.1.3 as well as its implied obligations to cooperate with Moore and to refrain from hindering Moore's performance. *Chalender v. United States*, 119 F.Supp. 186, 190 (Ct.Cl.1954); *George A. Fuller Co. v. United States*, 69 F.Supp. 409, 411–12 (Ct.Cl.1947); and *Kenworthy v. State of California*, 236 Cal.App.2d 378, 383, 46

Cal.Rptr. 396, 400 (1965). See also Restatement (Second) of Contracts § 205 (1979) and 11 S. Williston, *A Treatise on the Law of Contracts* § 1296 (3d ed. 1968). It is also based upon the theory that Moore was the beneficiary of Kennon's contractual agreement with the Department to be responsible for any damages it might cause to other contractors performing work on the same project.

In the context of a construction project based upon contract documents such as the ones involved in this case, we find that it is reasonably foreseeable that a contractor whose ability to complete its work is impaired by the owner and whose performance is thereby substantially delayed will suffer direct damages and that the extent of these damages will depend upon the unique facts of each case. These damages can include, among other things, increased payroll and other labor costs, increased material costs, costs resulting from the loss of efficiency of the use of equipment, increased costs for extended bonding and insurance coverage, and other increased overhead items that can reasonably be attributed to the performance of the work that was delayed. See generally *Foster & Creighton Co. v. Wilson Contracting Co.*, 579 S.W.2d 422, 428 (Tenn.App.1978).[31]

█ Accordingly, we find that like the claimed increase in the cost of the fencing and the gates, Moore can properly claim as damages its increased supervisory costs attributable to the delay, its increased overhead expenses attributable to the delay, and its losses due to the loss of efficiency in the use of its equipment. However, Moore must present adequate proof of these damages in order to recover. We do not agree with Moore that it can include as damages its loss of use of the interest accruing on its retainage or its loss of use of the interest it might have been able to earn on the contract funds that remained unpaid while the delayed work was completed. The accrual of such interest is, at best, a special damage that was not within the contemplation of the parties.

## V.

### Moore's Proof of Damages

█ We now turn to the question of whether Moore put on sufficient proof to support its claim for damages. We review

the proof keeping in mind that uncertain, contingent, or speculative damages should not be awarded. *Maple Manor Hotel, Inc. v. Metropolitan Government of Nashville and Davidson County*, 543 S.W.2d 593, 599 (Tenn.App.1975). However, uncertain and speculative damages are prohibited only when the existence of damages is uncertain not when the amount of the damage is uncertain. *Cummins v. Brodie*, 667 S.W.2d 759, 765 (Tenn.App.1983). Courts will allow damages for breach of contract even where it is impossible to prove the exact amount of damages. *Provident Life and Accident Insurance Co. v. Globe Indemnity Co.*, 156 Tenn. 571, 576, 3 S.W.2d 1057, 1058 (1928). All that is required is proof with a reasonable degree of certainty. *Buice v. Scruggs Equipment Co.*, 37 Tenn.App. 556, 571, 267 S.W.2d 119, 125–26 (1953).

█ Moore first claims that its cost to install the fence and gates had been increased by $923.60 because its subcontractor had notified the company in May, 1982, that its unit costs were being increased. However, Moore admitted that it had not paid these increased costs. In this regard, Mr. Moore testified

> I think their sub-contract was based or tied solely to the contract we had with the Department of Electricity. Whatever was good for the contractor would have been good for the sub-contractor and vice versa. Therefore when he asked me for a price increase I said I'll present it to the Department of Electricity and see what happens.

The testimony indicates that Moore would not be required to pay its subcontractor any additional costs for the fence unless the Department agreed to the requested price increase. This is an insufficient basis upon which to award damages because

---

31. Many of these costs are recognized in Article 12.1.4 of the General Conditions of Moore's contract which provides for the determination of the cost of extra work. This provision specifically recognizes (1) the cost of material, (2) the cost of labor (including benefits), (3) bond premiums, (4) insurance, (5) the rental value of equipment and machinery, and (6) supervisory and field office expenses directly attributable to the change.

there is no showing that Moore has or will ever incur these costs.

■ Moore next claims increased labor costs in the amount of $11,373.89 which represents additional salary paid to six supervisory and central office personnel. The record shows without contradiction that four of these persons routinely visited the job site while the work was delayed for the purpose of making sure that their work was not being damaged and to determine when Moore would be able to resume its performance and complete its work. The four people who visited the job site were there for the equivalent of two days each week.

The additional salaries of Moore's foreman and project superintendent were taken from the company's weekly cost records and represent the actual amount of time they were on the job. However, the salaries of the other two employees were determined based upon a factor relating to the balance of the unpaid amount of this contract when compared to the total amount of other business the company had at the time. While the proof of the additional salary Moore was required to pay its foreman and project superintendent is competent and provides an adequate basis upon which to award damages, the manner in which the additional payroll costs for the other four employees was determined was not. Therefore, we find that Moore should have received an additional $6,197.08 which represents the extra salaries it was required to pay to its foreman and project superintendent because of this delay.

■ Finally, Moore claims that it should be entitled to recover $3,560.40 which represents two months of its purchase payments on two pieces of equipment it was not able to use to the fullest possible extent because of the delay. There is no dispute that Moore was using this equip-ment on the job, but there is no proof that the equipment was purchased primarily for use on this job or that its cost was being allocated entirely to this job. Apparently it was not because Moore took the prudent step of using the equipment on other projects during the time it was delayed. Moore did not prove that this equipment cost was incurred because of the delay, and therefore, this claim should be denied.

■ It is also proper, as the trial court found with reference to the extra work Moore was asked to perform,[32] to award a contractor damages for its increased overhead resulting from being delayed through no fault of its own. At trial, persons familiar with the practice of contractors in the Clarksville area testified that it was customary for contractors to allocate 30 percent of their actual payroll costs to pay for their employees' insurance and other benefits and to add an additional 15 percent of their actual payroll cost for general overhead. This general overhead includes office personnel costs, utility bills, office rent, and vehicles and machinery not directly charged to a particular job. Based upon this testimony, we have determined that Moore's recovery should be increased proportionally to recognize its increased overhead costs resulting from the delay.[33] Thus, in addition to the $6,197.08 we have already found Moore should receive, Moore is also entitled to receive $1,859 for its increased insurance and benefit costs, and $930 for its increased general overhead expenses. Based upon *Moorhead Construction Co. v. City of Grand Forks*, 508 F.2d 1008, 1015–16 (8th Cir.1975), and *J.D. Hedin Construction Co. v. United States*, 347 F.2d 235, 259–60 (Ct.Cl.1965), we find that Moore is not entitled to receive a profit on the increased costs it incurred because of the delay caused by the Department and Kennon.

---

**32.** The trial court awarded Moore overhead and profit on the extra work it was required to perform. See footnote no. 13, *supra*.

**33.** This award adequately recognizes Moore's cost of the two pieces of equipment which were idled for two months and its central office payroll.

Based upon the foregoing, we affirm so much of the trial court's decision that awarded Moore $2,719.15 for the extra work it was required to perform on the project. The trial court's decision with regard to Moore's claim for delay damages against the Department and Kennon is modified to award Moore $8,986.08 against the Department and Kennon jointly.

The costs of this appeal are taxed in equal proportions against the Department and Kennon and their respective sureties for which execution, if necessary, may issue.

LEWIS and CANTRELL, JJ., concur.