**SUITT CONSTRUCTION CO., INC., and Worley Construction Co., Inc., Plaintiffs–Appellees,**

v.

**RIPLEY'S AQUARIUM, LLC and Travelers Casualty & Surety, Defendants,**

and

**Blalock Lumber Co., L.P., Defendant–Appellant.**

No. 03–5070.

United States Court of Appeals, Sixth Circuit.

Aug. 17, 2004.

Brian G. Corgan, Kilpatrick & Stockton, Atlanta, GA, John O. Threadgill, The Threadgill Law Firm, James F. Little, Woolf, McClane, Bright, Allen & Carpenter, Knoxville, TN, for Plaintiff–Appellee.

Charles A. Wagner, III, W. Turner Boone, Wagner, Myers & Sanger, Knoxville, TN, Gregory Lee Cashion, Smith & Cashion, Nashville, TN, for Defendant–Appellant.

Before: SUHRHEINRICH and GIBBONS, Circuit Judges; and LAWSON, District Judge.*

* The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

GIBBONS, Circuit Judge.

Defendant-appellant Blalock Lumber Co. ("Blalock") brought this appeal for review of a district court decision denying Blalock's motion for a new trial, or alternatively, to alter or amend a jury verdict in favor of plaintiff-appellee Suitt Construction Co. ("Suitt"). For the following reasons, we affirm the judgment of the district court.

## I.

On March 29, 1999, defendant Ripley's Aquarium, LLC ("Ripley's") entered into a contract with Suitt for the construction of Ripley's Aquarium in Gatlinburg, Tennessee (the "Aquarium"). The Aquarium has 110,000 square feet of enclosed space with numerous exhibits, a gift shop, and a kitchen. It has several themed display tanks, including: Dangerous Reef, Tropical Rainforest, Rainbow Reef, Ray Bay, and Groupers and Eels. The Aquarium is built primarily of concrete, which is reinforced with steel. Suitt, the general contractor, entered into agreements with several subcontractors. Most importantly for purposes of this appeal, Suitt entered into an agreement with Blalock, pursuant to which Blalock agreed to supply the concrete for the project. Suitt also entered into separate subcontracts with Worley Construction Co., Inc. ("Worley") and Schaefer Interstate Railing, Inc. ("Schaefer"). Ripley's hired a separate contractor, Manwarren, to install the underwater theming in the tanks.

The date of substantial completion refers to the date at which the Aquarium was to be ready to open for business. The contract between Ripley's and Suitt originally established the date of substantial completion as July 10, 2000. Due to delays for which Ripley's was responsible, the parties agreed to push the substantial completion date back to July 31, 2000.

The contract provided for liquidated damages of $15,000 per day for each calendar day after the date of substantial completion until the work actually was substantially completed. The contract also provided for a grace period and a liquidated damages cap. The grace period allowed that no liquidated damages would accrue during the first fourteen days after the substantial completion date specified in the contract. The cap provided that liquidated damages would in no event exceed $705,000, or forty-seven days of liquidated damages at $15,000 per day.

The contract specified certain requirements for the concrete. The two most important requirements concerned the compressive strength of the concrete and its water/cement ratio. The compressive strength of the concrete refers to how many pounds of pressure per square inch ("psi") the concrete can withstand before it breaks. The concrete to be supplied by Blalock for the aquarium tanks was to have a compressive strength of 5,000 psi. The water/cement ratio is calculated by dividing the weight of water in a cubic yard of concrete by the weight of the cement and fly ash, a filler used in concrete. The water/cement ratio was to be no higher than .40. The project specifications required that a 5,000 psi, .40 water/cement ratio concrete mix be used in all applications of "concrete against water," including the aquarium tanks. Blalock does not dispute that it contracted to provide concrete with these characteristics.

On August 5, 1999, Suitt sent Blalock concrete test reports which showed that the concrete used to pour the Dangerous Reef tank did not meet the specified strength of 5,000 psi. The concrete used in the Dangerous Reef was especially important because, besides being very large, the Dangerous Reef supported other parts of the building. Blalock responded that the

312

concrete was of good quality and the low measurements must have been caused by testing inconsistencies.

Each load of concrete delivered to the project had a corresponding "batch ticket" which gave information about the load. Batch tickets in Blalock's possession showed that the water/cement ratio in many of the batches exceeded .40. Suitt contends that it did not have access to this information at the time it received each load of concrete. It alleges that Blalock representatives tore off the bottom portion of each batch ticket as each truck left the plant and sent only the top portion of the batch ticket to the project site. Kevin Blalock, manager of Blalock's concrete operations, acknowledged at trial that Suitt had no knowledge of the defective nature of the concrete until September 9, 1999, when Blalock faxed copies of the batch tickets to Suitt.

Upon receipt, Suitt showed the batch tickets indicating the high water content to Ripley's structural engineer, Miklos Peller. Peller was concerned about the higher porosity, lower density, and decreased durability of the concrete due to its deviation from Suitt's specifications. Because of the high water content of the concrete, the walls made from it would be less impervious to the water contained in the tanks. Over time, water would seep in and damage the steel encased in the concrete. Because of the defective concrete, Ripley's and Peller determined that, pursuant to the contract, Suitt would either have to coat the Dangerous Reef tank walls with a liner with the brand name "Polibrid" or remove and replace the concrete.

The Dangerous Reef tank contains a moving sidewalk encased in an acrylic tunnel which allows patrons to literally walk through the tank. Before the Polibrid liner could be installed, Nipurra, the company supplying the acrylic tunnel, had to conduct tests to determine whether the acrylic and the liner were compatible and would create a watertight seal. The delay involving the acrylic installation delayed Manwarren's theming work, which included painting the tanks and installing simulated underwater plant life. Theming was originally scheduled to begin on October 15, 1999, but was delayed until February 16, 2000. Suitt asserts that Blalock's defective concrete delayed substantial completion by ninety-two calendar days, but that by rescheduling projects not on the "critical path," Suitt reduced the delay to seventy-nine days.[1] On January 24, 2000, Suitt issued a revised construction schedule which showed that the substantial completion date had been pushed back to October 18, 2000, as a result of delays associated with the concrete. Blalock admits that its defective concrete caused the entire seventy-nine day delay. The project was not substantially completed on October 18, 2000, either. Further delays attributable to Ripley's and Manwarren delayed the actual substantial completion date until December 15, 2000. Suitt does not contend that Blalock was responsible for this further delay.

II.

On March 30, 2001, Suitt filed a complaint in the United States District Court for the Eastern District of Tennessee against Ripley's, Blalock, Worley, Schaefer, and the bonding companies for Worley

1. A project's "critical path" is the longest chain of construction events within a project schedule. Each of the events or tasks that falls on the critical path must be performed in a timely fashion or the project's completion will be delayed. Construction events that are not on the critical path have "float." In other words, the time at which they are to be performed may be changed without impacting the project's completion.

and Schaefer. Suitt's complaint sought judgment against Ripley's for the contract balance of over $3,000,000 plus interest; judgment against Blalock for breach of the concrete purchase contract and for breach of implied warranties of merchantability and fitness for a particular purpose in an amount over $1,000,000 plus interest; judgment against Worley for breach of contract and express warranties in an amount over $500,000 plus costs, expenses, attorney fees, and interest; and judgment against Schaefer for breach of contract and express warranties in an amount over $500,000 plus costs, expenses, attorney fees, and interest.

On May 9, 2001, Ripley's filed an answer and counterclaim against Suitt seeking judgment against Suitt in an amount over $12,360,000. Suitt settled its claims with Ripley's, Worley, and Schaefer, and those parties were dismissed from the lawsuit. Suitt and Ripley's reached a settlement agreement under which Ripley's paid Suitt $2,416,283, a portion of the outstanding contract balance. The settlement agreements between Suitt and Worley and Suitt and Schaefer are confidential. Suitt then filed an amended complaint which reflected the settlements and dismissals and contained only Suitt's claims against Blalock. Suitt's action against Blalock was tried before a jury from July 15–18, 2002. Suitt sought damages in the amount of $921,572.78, which included: $98,848.39 for Polibrid repairs plus $22,462.59 in interest; $400,000.00 in liquidated damages plus $71,555.74 in interest; $261,535.03 for extended general conditions, or overhead expenses, plus $15,446.88 in interest; $14,368.00 for acrylic storage plus $2,204.73 in interest; and $30,512.10 for experts to advise on repairs plus $4,684.35 in interest.

The jury returned a verdict in favor of Suitt in the amount of $806,000. Blalock asserts, and we agree, that it is likely that the jury simply awarded Suitt the full amount of actual damages and refused to award substantial interest. On August 5, 2002, Blalock filed motions to alter or amend the verdict, for judgment notwithstanding the verdict, and for a new trial. Blalock then withdrew its motion for judgment notwithstanding the verdict because it had failed to make the requisite motion for a directed verdict at trial. The district court denied Blalock's remaining motions on December 19, 2002.

Blalock filed a timely notice of appeal on January 9, 2003. On appeal, Blalock challenges the jury's verdict only to the extent that it holds Blalock responsible for the $400,000 in liquidated damages Suitt paid to Ripley's, and to the extent the jury determined that Suitt is entitled to recover from Blalock its full general conditions costs of $3,310.56 per day times the seventy-nine day delay attributable to Blalock's delivery of defective concrete. Blalock does not contest its liability for the Polibrid repairs, acrylic storage, and expert costs.

## III.

In a diversity case such as this one, federal law governs the district court's decision whether to grant a new trial or to alter or amend the judgment under Fed. R.Civ.P. 59. *Conte v. General Housewares Corp.*, 215 F.3d 628, 637 (6th Cir.2000). We review the district court's decision for an abuse of discretion. *Id.* In order to find an abuse of discretion, we must have a "definite and firm conviction ... that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Id.* (citation omitted). We "may grant a new trial under Rule 59 if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was

influenced by prejudice or bias, or otherwise unfair to the moving party." *Id.* However, the "jury's verdict should be accepted if it is one which could reasonably have been reached." *Id.*

## IV.

Blalock contends that the district court erred in denying its motion for a remittitur or a new trial because "there was no evidence from which the jury could determine that Blalock's supply of out-of-spec concrete proximately caused Suitt's payment of the $400,000 liquidated damages settlement amount to Ripley's or its incurrence of $261,535.03 of extended general conditions costs." We disagree. Tennessee law permits the recovery of all damages that are the normal and foreseeable result of a breach of contract. *Moore Constr. Co. v. Clarksville Dep't of Elec.,* 707 S.W.2d 1, 14 (Tenn.Ct.App.1985). Blalock's sale of concrete to Suitt was a transaction in goods subject to Tennessee's Uniform Commercial Code, Tenn.Code Ann. § 47–2–101 *et seq.* Under Tenn.Code Ann. § 47–2–715(2) (2003), a buyer may recover consequential damages from a seller's breach. Consequential damages include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Tenn. Code Ann. § 47–2–715(2)(a).

As the Tennessee Court of Appeals has stated, "[i]f a direct out-of-pocket expense is incurred by a party as a direct and proximate result of a breach of contract, that expense, if within the contemplation of the parties, is a consequential damage." *First Tenn. Bank Nat'l Ass'n v. Hurd Lock & Mfg. Co.,* 816 S.W.2d 38, 43 (Tenn. Ct.App.1991). The delayed party in a construction contract may recover, among other things, "increased payroll and other labor costs, increased materials costs, costs resulting from the loss of efficiency of the use of equipment, increased costs for extended bonding and insurance coverage, and other increased overhead items that can reasonably be attributed to the performance of the work that was delayed." *Moore Constr. Co.,* 707 S.W.2d at 15.

The delayed party "must present adequate proof of these damages in order to recover." *Id.* The buyer must prove consequential damages by a preponderance of the evidence. *First Tenn. Bank Nat'l Ass'n,* 816 S.W.2d at 43. "[U]ncertain, contingent, or speculative damages should not be awarded. However, uncertain and speculative damages are prohibited only when the existence of damages is uncertain not when the amount of the damage is uncertain. Courts will allow damages for breach of contract even where it is impossible to prove the exact amount of damages. All that is required is proof with a reasonable degree of certainty." *Moore Constr. Co.,* 707 S.W.2d at 15.

### A. Liquidated Damages

■ Blalock argues that it should not be held solely responsible for the $400,000 in liquidated damages paid by Suitt to Ripley's. While Blalock does not dispute that its defective concrete caused a seventy-nine day delay, it asserts that "there is no proof that this delay, as opposed to other delays caused by Suitt and its subcontractor Worley, was the proximate cause of Suitt's settlement payment of $400,000 to Ripley's for liquidated damages." As explained above, the project suffered from a seventy-nine day delay caused wholly by Blalock that ran from July 31, 2000, until October 18, 2000. Then other parties, not Blalock, caused delays that ran from October 19, 2000, until December 15, 2000. Blalock argues that Ripley's should have been required to present proof allocating

the liquidated damages settlement between Blalock, Suitt, and Worley.

We find that Suitt presented adequate proof to allow the jury to reasonably conclude that Blalock's seventy-nine day delay was responsible for the entire liquidated damages settlement amount. A review of the timeline of events serves to clarify our resolution of the issue. The revised substantial completion date was July 31, 2000. Because the project was not substantially complete on this date, a contractual grace period started to run. The grace period ended on August 14, 2000. On August 15, 2000, liquidated damages began to accrue in the amount of $15,000 per day. On September 30, liquidated damages reached their contractual maximum of $705,000. On October 9, 2000, Ripley's sent Suitt a letter informing it that the full amount of liquidated damages was being assessed against Suitt for the period from August 15, 2000, through September 30, 2000. Significantly, Blalock was solely responsible for the delay during this period. By the time the delays caused by the other parties began on October 18, the entire amount of the liquidated damages had already been incurred. Based upon this fact, the jury could reasonably have concluded that Blalock was responsible for the entire contractual amount of liquidated damages, or $705,000, which Suitt negotiated down to $400,000 in a settlement agreement with Ripley's.

■ Blalock also argues that Suitt is barred from collecting liquidated damages from Blalock because Suitt contributed to the delay for which the liquidated damages were assessed. Blalock correctly points out that under Tennessee law, "[l]iquidated damages will not be awarded to one that has contributed to or mutually caused the delay or breach." *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 262 (Tenn.Ct.App. 1990). Thus, it argues, because Suitt contributed to the delays that eventually delayed substantial completion until December 15, 2000, it cannot recover liquidated damages from Blalock. This argument fails because Blalock has admitted that it caused the entire seventy-nine day delay for which liquidated damages were assessed. Thus, Suitt is not barred from recovering liquidated damages by this rule.

### B.   Extended General Conditions Costs

■ Under Tennessee law, a contractor may recover damages for its increased overhead costs resulting from a delay. *Moore Constr. Co.*, 707 S.W.2d at 16. According to Suitt's calculations, its average daily overhead cost for the period of delay caused by Blalock was $3,310.56. Suitt multiplied $3,310.56 by seventy-nine, the number of days of delay caused by Blalock, to arrive at its extended general conditions damages figure of $261,535.03.

Blalock argues that Suitt is not entitled to the full amount of general conditions costs awarded by the jury because "[t]here is no evidence from which a jury could find that Blalock's delay caused Suitt to suffer extended general conditions costs because Suitt never presented any evidence that its workmen were idle more than one or two days as a result of Blalock's supply of the out-of-spec concrete or that Suitt failed to receive any benefit from the work it performed during that period." Blalock apparently does not dispute the amount of Suitt's daily overhead costs. Rather, its argument is that Suitt derived a benefit from the work it performed on at least seventy-seven of the days during which Blalock delayed the project. According to Blalock, Suitt performed tasks not on the critical path and worked on a repair to the Ray Bay tank caused by its own improper installation of a window. In its own words, Blalock alleges that "Suitt used the float time created by Blalock's delay to perform

changes and corrective work that otherwise would have delayed the critical path, and the evidence is undisputed that Suitt worked and received a benefit from the general condition expenses incurred during the 79–day delay attributable to Blalock." Blalock argues that "Suitt provided no proof as to how many days the project would have been delayed absent Blalock's delay, and without such proof, there was no way for the jury to determine how many days of extended general conditions expenses were incurred as a result of Blalock's delay."

Here, Suitt has met its burden of proving the damages caused by Blalock's admitted delay. Blalock could have presented evidence of any benefit Suitt derived from the work it performed during the delay, and how this benefit should offset Suitt's damages. Blalock, however, has put forth no evidence in support of its contention that the seventy-nine day delay in some way benefitted Suitt. As far as we know, Suitt could have completed whatever work it did during the delay at some other time without impacting the project's substantial completion date. Because Blalock has presented no such evidence, we find that the district court did not err in denying Blalock's motions on this issue.

## V.

For these reasons, we affirm the judgment of the district court denying Blalock's motion.