IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
_____

**BONHAM GROUP INC.,**

     Plaintiff-Appellant,

Vs.

**CITY OF MEMPHIS and
COUNTY OF SHELBY,**

     Defendants-Appellees.

Shelby Chancery No. 100896-1
C.A. No. 02A01-9709-CH-00238

**FILED**

**April 16, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

FROM THE CHANCERY COURT OF SHELBY COUNTY
THE HONORABLE NEAL SMALL, CHANCELLOR

Tim Edwards; Glassman, Jeter, Edwards and Wade, P.C. of Memphis
For Appellant

Joseph T. Getz, Michael D. Herrin; Less, Getz & Lipman of Memphis
For Appellees

*AFFIRMED AND REMANDED*

Opinion filed:

**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

**ALAN E. HIGHERS, JUDGE**

**DAVID R. FARMER, JUDGE**

This appeal involves yet another of the multiple disputes that arose in connection with

the construction of The Pyramid arena in Memphis.  Appellant, Bonham Group Inc. (Bonham),[1]

appeals the order of the trial court dismissing its suit against Appellees, City of Memphis (City)

and County of Shelby (County).

On April 14, 1989, the City and County executed an agreement with Pyramid

Management Authority, Inc. (PMA) whereby PMA was to develop, operate and manage a multi-

use arena (the Pyramid) and a theme park development on Mud Island.  PMA was headed by

Sidney Shlenker.  In June 1989, PMA orally contracted with Bonham to solicit and negotiate

contracts with sponsors and concessionaires for the project.   This agreement was reduced to

writing by letter dated July 23, 1990, which states:

> July 23, 1990
>
> Mr. Sidney Shlenker
> President and Chief Executive Officer
> The Pyramid Companies
> 245 Wagner Place
> Memphis, Tennessee 38103
>
> Dear Sidney:
>
> Although Bonham/Shlenker & Associates and the Pyramid
> Companies have been working together for more than a year, we
> haven't yet formalized our contractual agreement.  As you and
> John and I have discussed, it would be in both companies' best
> interests to commit our heretofore verbal agreement to writing.
>
> In order to ensure that the Pyramid Companies and
> Bonham/Shlenker & Associates are in agreement with both the
> scope of the work and the method of payment, I ask that you read
> this letter carefully to review its contents.  In this way, we can
> both have a better, more permanent understanding of the
> responsibilities each company has to the other.  If this letter does
> reflect our understanding, please sign both copies and return one
> to Bonham/Shlenker & Associates.
>
> *Scope*
>
> Bonham/Shlenker & Associates has provided (and will continue
> to provide) services in the area of sponsorship
> development/contract negotiations for The Great American
> Pyramid.  In this regard, "contract negotiation" also refers to
> related areas of economic development; for example, the
> concessions and tenant contracts we negotiated with National
> Pizza Co. and Memphis State University, respectively.  Also,
> under the direction of Pyramid management, B/S&A will have
> limited responsibility for follow-up and fulfillment on

---

[1]  Bonham Group Inc. is a successor corporation to both Bonham/Shlenker and Associates and Bonham Communications, Inc.  Dean Bonham is the president and CEO of Bonham.

sponsorship contracts it negotiates on behalf of the Pyramid Companies.

B/S&A's objective will be to create $9.5 million in annualized sponsorship/concession contracts for the Pyramid Companies. Our goal will be to negotiate agreements with ten-year terms; however, in no case will the terms be for less than five years.

Dean A. Bonham, president of Bonham/Shlenker & Associates will be the account manager for this project. Mr. Bonham will devote no fewer than 160 hours per month to The Great American Pyramid. Serving as assistant account manager will be Tom Lawrence, BS&A's executive vice president. The Great American Pyramid will be Mr. Lawrence's primary client, and will exercise first priority on his time and efforts.

*Terms of Agreement*

Bonham/Shlenker & Associates was originally retained by the Pyramid Companies in June 1989. The arrangement is open-ended. Termination may occur at the request of one or both parties, with 30 days prior written notice.

*Compensation/Collection*

The Pyramid Companies agree to pay Bonham/Shlenker & Associates as follows:

Retainer: A $15,000 monthly retainer, plus expenses. The retainer is to be paid within ten days of the receipt of each monthly invoice.

Commission: Fifteen percent (15%) of gross revenues derived from sponsorship contracts, minus any retainer amounts paid by the Pyramid Companies to B/S&A.

7½% of gross revenues derived from concessions contracts not to exceed $1,200,000.

7.5% of gross revenues derived from the renewal of any sponsorship contracts. (No renewal fee will be paid on the concession contract unless mutually agreed upon. Such an agreement, it is understood, would be based upon the degree and kind of assistance provided by B/S&A.)

The commission fees will be assessed annually and are due and payable within ten (10) days of the Pyramid Companies' receipt of revenues from its sponsorship/concession contracts.

Bonham/Shlenker & Associates' receipt of any commissions is subject to the following proviso:

Prior to the Pyramid Companies' annual payment to B/S&A of 15% of gross sponsorship fees negotiated on behalf of The Pyramid by B/S&A, Pyramid management will provide an accurate accounting of the exact dollar amount of the monthly retainers that has been paid to B/S&A during the calendar year July 1 - June 30. Subsequent to this, half of B/S&A's 15% commission will be paid to B/S&A. The remaining half will be

withheld until the entire amount of dollars paid in monthly retainers to B/S&A has been repaid to the Pyramid Companies. After the Pyramid Companies have been reimbursed in this manner, 100% of all commissions due will be paid directly to B/S&A.

*Reimbursement of Expenses*

Bonham/Shlenker & Associates will bill you at our costs for reimbursement of all out-of-pocket expenses incurred on your behalf. These expenses will include, but are not limited to, photography, printing, messengers, transportation, duplicating and postage on mailings.

*Protection of the Pyramid Companies*

No major out-of-pocket expenses will be undertaken by Bonham/Shlenker & Associates without the approval of the Pyramid Companies. We will maintain accurate records of all expenditures made on your behalf. We will be prepared to supply reasonable supporting detail of these expenses as requested by the Pyramid Companies.

In the event the Pyramid Companies question the validity of any charge by Bonham/Shlenker & Associates, payment for only that portion under question may be delayed.

All information, facts and figures pertaining to the Pyramid Companies or the project that come to our attention will be handled in a confidential manner.

The City and County were not parties to this contract. Bonham's compensation to be paid by PMA (referred to in the contract as the Pyramid Companies) was based on a monthly retainer of $15,000.00 which was offset by a fifteen percent commission of the gross revenues derived from sponsors and concessionaires brought in by Bonham.

In August of 1988, before PMA or Bonham became involved, the City and County executed an agreement with Memphis State University (MSU) for the use of the arena for basketball. The MSU Agreement provided for state funding of seven million dollars for construction and use of the facility. This contract gave MSU certain concessions on advertising, parking and luxury suites. These concessions hampered Bonham's efforts to negotiate contracts with sponsors and concessionaires. As a result, Bonham renegotiated the MSU contract which was executed between the Tennessee Board of Regents, MSU and PMA on August 3, 1990. This resulted in an additional $2.2 million contributed by the state toward the construction and use of the arena.

Bonham also negotiated a number of sponsor and concessionaire contracts on behalf of

and for the benefit of PMA. These included Pepsi-Cola Company and its local distributor Delta Beverage, Inc., National Pizza Company, Acquisition Services Corp. (now known as National Catering Company and a wholly owned subsidiary of National Pizza Company), Federal Express Corporation, Phillips Consumer Electronics Company, Sara Lee Corporation, Wang Laboratories, Inc., VISA USA, Inc., and Dodge Dealers, Inc. Bonham received his monthly retainer under his contract with PMA but did not receive any commission. On February 13, 1991, PMA terminated its contract with Bonham due to an internal dispute concerning the schedule of opening the facilities.

Shortly after Bonham had signed on, PMA began having problems performing its contract with the City and County due to the fact that Shlenker could not arrange the financing necessary to open the Pyramid and the other facilities. This problem became serious as basketball season approached because the City and County were required to have the arena ready for the first MSU basketball game of the season. On June 17, 1991, the City and County terminated their contract with PMA after it was apparent that PMA was unable to perform its contract.

Facing the soon approaching basketball season, the City and County took over the project, and in light of the approaching deadline, were forced to forego all the proposed projects except the completion of the arena for the basketball season. Under these circumstances, the City and County were unable to fulfill the contracts previously negotiated by Bonham since those contracts covered several facilities. Furthermore, two of the concessionaires, National Pizza Company and National Catering Company, that Bonham had contracted with, were threatening to force the City and County to honor the contracts with PMA on the basis of a non-disturbance agreement that the City and County executed for the concessionaires at the request of Bonham.

The City and County employed Leisure Management of Memphis, Inc. (LMM) to manage and oversee the completion of the Pyramid. Working under enormous time constraints, the City and County arranged for LMM to solicit sponsors and concessionaires for the arena. LMM sent out request for proposals (RFP) to several prospects including the sponsors and concessionaires that Bonham had previously contracted with. These RFPs contained specifications materially different from the provisions of the contracts previously negotiated by

5

Bonham. Shortly thereafter, LMM entered into contracts covering sponsorship and concessions with several companies which included entities that Bonham had previously contracted with - National Pizza Company, National Catering Company and Pepsi-Cola.

On December 20, 1991, Bonham filed a complaint against the City and County seeking damages in the amount of five million dollars under the theory of unjust enrichment. The City and County's answer denies the material allegations of the complaint and joins issue thereon. A third party complaint was also filed by the City and County against Dean Bonham and John Tigrett. On April 24, 1997, Bonham filed an amended complaint seeking relief under the theories of breach of contract, unjust enrichment, tortious interference with contract and tortious interference with business relationships. The City and County answered the amended complaint and filed a motion for summary judgment. By order entered July 30, 1997, the trial court granted the City and County's motion for summary judgment as to Bonham's claims of tortious interference with contract and tortious interference with business relationships and denied the motion as to the breach of contract and unjust enrichment claims.

After a non-jury trial, the trial court entered an order dismissing the claims of Bonham and the claim asserted by the City and County.

Bonham appeals[2] and sets forth in its brief three issues for review as follows:

> I.  After correctly finding that Plaintiff was responsible for restructuring the key contract for the Pyramid Arena, i.e. the Memphis State University basketball contract, which resulted in a contribution of $2.2 million to the Pyramid Arena, the Trial Court improperly concluded that Plaintiff was not entitled to compensation for this effort.
>
> II.  After correctly finding that sponsor/vendor contracts for which Plaintiff was responsible yielded over $1,000,000.00 to the development of the Pyramid project, the Trial Court improperly concluded that no benefit had been conferred on Defendants and therefore Plaintiff was not entitled to compensation.
>
> III.  After correctly finding that National Pizza Company and its subsidiary Acquisition Services Corp. (later National Catering Company) and Pepsi-Cola along with its local distributor Delta Beverage had been brought to and placed under contract with the Pyramid project by Plaintiff, the Trial Court improperly concluded that Plaintiff was not entitled to compensation after those contracts were re-negotiated by Defendants subsequent to the improper termination of the developer, Pyramid Management Authority.

---

[2]  The City and County did not appeal the dismissal of its third party complaint.

Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

The trial court filed written findings of fact and conclusions of law which are incorporated in the final decree and state in pertinent part as follows:

> Defendants could not fulfill the contracts negotiated by Bonham for PMA because those contracts covered several facilities and time would make it impossible to complete more than just one of these facilities, the arena, and even this was not certain. On the other hand, two of the vendors signed up by Bonham were threatening to force defendants to honor their contracts with PMA based on a non-disturbance agreement that defendants had signed for them at Bonham's request.

> Under the circumstances, the City and County did the best they could with time running out and possible lawsuits from MSU and the two vendors hanging over their heads. They arranged for Leisure Management, Inc. to solicit vendors and request for proposals (RFP) were sent out to many prospects including some, or perhaps all, of the vendors which Bonham had signed up. National Pizza and Pepsi-Cola, the two companies with non-disturbance agreements, were among the companies re-signed after first having signed contracts with Bonham for PMA, however, both agreed to drop any claims they had under the former contract as a part of their final agreement.

> Before PMA was terminated on June 17, 1991 by defendants, substantial sums of money, perhaps more than one million dollars, was advanced by various vendors, that Bonham had signed up, to PMA. However, there is insufficient proof in the record to indicate that defendants, City and County, ever received any of this money.

> Likewise, it is difficult for this Court to see other specific benefits from Mr. Bonham's admitted good efforts. Defendants may have been incidentally and indirectly benefited by Bonham's renegotiation of the MSU contract, but this was done to make his, Bonham's, work easier not primarily to benefit defendants. To set a value, if any, for this service would involve pure speculation.

> The new contracts were entirely different in size, scope, and amounts and covered only one facility instead of several as Bonham's contracts had done. This was not the fault of the defendants, but the fault of PMA, plaintiff's employer, who could not finish the facilities and perform the contracts that Bonham had secured.

> It is understandable that some of the vendors originally signed by Bonham were re-signed by Leisure Management which the defendants had hired to replace PMA. There are only two beverage companies in the entire country capable of handling a

7

facility as large as the Mud Island complex, Coca-Cola and Pepsi. Leisure Management, Inc. sent RFPs to both and it is nor surprising that Pepsi was again signed up in the second round even without considering the need for defendants to try to protect themselves from a lawsuit over the non-disturbance agreement. Another vendor, Ticketmaster, was the only company in the nation capable of servicing this kind of facility.

Not only does this Court find that the defendants did not profit from Bonham's effort, but it seems more likely that they suffered a detriment from the over-all performance of PMA of which Bonham was a part. Of all the facilities promised by PMA, only one, the arena, is even partially in place and usable today. To whatever extent these unfinished facilities would have benefited defendants, in gate receipts, sales tax, and publicity, that benefit has been lost.

Mr. Bonham appeared to be very effective in his efforts to secure business for PMA, but his contract was with PMA and it is to PMA that he must look for satisfaction. Once Bonham was terminated by PMA, he was of no further help to either PMA or defendants and the contracts he had secured were of no value to defendants, especially after PMA breached its contract with Memphis and Shelby County and was terminated.

The trial court concluded:

This Court finds that in this case, any benefits to, or enrichment of, defendants was incidental and inconsequential. Defendants were not third-party beneficiaries of the contract between PMA and Bonham, were not enriched and certainly not unjustly enriched, therefore plaintiff's case must fail.

Bonham's complaint presents two theories of recovery for matters encompassed in the issues.[3] The complaint first alleges that the defendants are third party beneficiaries of the contract between Bonham and PMA and, thus, as third party beneficiaries are liable to Bonham under the contract. Alternatively, the complaint avers that the City and County are liable to Bonham on the theories of unjust enrichment, *quasi* contract, contract implied in law, and *quantum meruit*.

**Third Party Beneficiary**

Tennessee recognizes two categories of third party beneficiaries - intended and incidental. *First Tennessee Bank Nat'l Ass'n v. Thoroughbred Motor Cars, Inc.*, 932 S.W.2d 928, 930 (Tenn. App. 1996). Only if the third party is an intended beneficiary may it maintain an action on the contract. *Moore Constr. Co. v. Clarksville Dep't of Electricity*, 707 S.W.2d 1, 9 (Tenn.

---

[3] Bonham presents no issue pertaining to tortious interference with contract or tortious interference with business relationships.

App. 1985). The requisites necessary to establish a third party beneficiary relationship are: (1) a valid contract made upon sufficient consideration between the promisor and promisee; and (2) the clear intent to have the contract operate for the benefit of a third party. ***United Am. Bank of Memphis v. Gardner***, 706 S.W.2d 639, 641 (Tenn. App. 1985). This intent to benefit may be shown if "there is either an expression in the contract that the contracting parties intended to benefit the third party (the 'intent to benefit' test) or proof that the promisor's performance will otherwise discharge a duty owed to a third party beneficiary by the promisee (the 'duty owed' test)." ***Moore Constr.***, 707 S.W.2d at 9. Whether a party is a third party beneficiary must be decided on a case-by-case basis in light of the specific contractual agreements and the circumstances under which they were made. ***Id.*** at 10.

Bonham asserts that the City and County are third party beneficiaries to the contract between PMA and Bonham, and, therefore, are liable under the contract for the commissions earned due to Bonham's efforts in renegotiating the MSU contract and in negotiating the various sponsor and concessionaire contracts.

We do not find it necessary to determine if the City and County are third party beneficiaries, and, if so, what type, since they are not seeking any relief under the contract. Bonham's assertion of liability against the City and County on the contract is unknown to the law. Bonham has not, and probably cannot, cite any authorities in support of this position. The very description of the status "third party beneficiary" belies an assertion of liability as an obligor. A beneficiary gets a benefit, not an obligation. To attempt to hold someone liable on a contract to which it is not a party is contrary to common reason. Accordingly, Bonham has no cause of action against the City and County for breach of contract.

### Unjust Enrichment

The theories of unjust enrichment, *quasi* contract, contracts implied in law, and *quantum meruit* are essentially the same. ***Paschall's, Inc. v. Dozier***, 219 Tenn. 45, 53, 407 S.W.2d 150, 154 (1966). Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist. ***Whitehaven Community Baptist Church v. Holloway***, 973 S.W.2d 592, 596 (Tenn. 1998) (citing ***Paschall's***, 219 Tenn. at 53-54, 407 S.W.2d at 154-55). Such contracts are not based upon the intention of the parties but are obligations created by law and are "founded on the principle that a party

9

receiving a benefit desired by him, under the circumstances rendering it inequitable to retain it without making compensation, must do so." **Paschall's,** 219 Tenn. at 54, 407 S.W.2d at 154. A contractual obligation under an unjust enrichment theory will be imposed when: (1) no contract exists between the parties or, if one exist, it has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation. **Holloway**, 973 S.W.2d at 596. In **Paschall's, supra**, the Court stated:

> Each case must be decided according to the essential elements of quasi contract, to-wit: A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.

219 Tenn. at 57, 407 S.W.2d at 155.

The most significant requirement for a recovery under this theory is that the enrichment must be unjust. **Id.** Consequently, if the defendant has given any consideration to anyone for the benefit, it would not be unjust for the defendant to retain the benefit without paying the provider of such. Furthermore, before recovery can be had against the defendant on the theory of unjust enrichment, the provider of the benefit must have exhausted his remedies against the person with whom he had contracted, and still has not received the reasonable value of his services. **Id.**

In the record, testimony was introduced that while Bonham negotiated some contracts between PMA and various sponsors and concessionaires, the substance of these contracts covered a project that was different in size and scope from the contracts which were subsequently negotiated and actually used. The record reveals extensive efforts on the part of the City and County, necessitated by the change in the size and scope of the project, in sending out RFPs to numerous sponsors and concessionaires and the procurement of new contracts with such. Moreover, the proof showed that no one ever operated under the contracts negotiated by Bonham. The record also reflects that payments made by any of the contractees were received by PMA. Testimony was introduced that the City and County never received any of the funds, and there is no proof that the payments made to PMA benefited the City and County.

Bonham also seeks recovery by virtue of the renegotiation of the MSU Agreement. The testimony in the record indicates that the MSU Agreement did not provide exclusive control to

MSU for all of the parking, all of the advertising and all of the luxury suites. Admittedly, the new MSU Agreement allowed PMA more flexibility in its solicitation with sponsors and concessionaires, but the renegotiation of the contract was procured for the benefit of PMA to allow this flexibility. Bonham also claims that he is entitled to a commission on the procurement of $2.2 million from the renegotiated MSU/PMA contract. Proof is lacking that Bonham's efforts secured the $2.2 million from MSU or that it directly benefited the City and County.

During the hearing, extensive testimony was introduced that the City and County did not derive any benefit from Bonham's actions in connection with his work with PMA. Admittedly, this testimony conflicts with some of the other evidence introduced on behalf of Bonham. The trial court made detailed findings of fact, and obviously the findings on the disputed issues were largely dependent on the credibility of the witnesses. Any conflict in the testimony requiring a determination of the weight, faith, and credit of any witness's testimony rests in the first instance with the trial court and will be given great weight by the appellate court unless other real evidence compels a contrary conclusion. *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 302 (Tenn. App. 1984).

Whether a benefit has been conferred and the value of such benefit is a fact question. Therefore, the finding by the trial court comes to us with a presumption of correctness. From the record before us, we do not find that the evidence preponderates against the findings of the trial court.

Bonham has also presented in this Court an issue concerning agency on the part of Bonham acting for the City and the County. However, the record reflects that he failed to present this as a theory in his complaint and did not present the issue in the trial court, and this is raised for the first time on appeal. As a general rule, questions or issues not raised in the trial court will not be entertained on appeal. *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983); *City of Lavergne v. Southern Silver, Inc.*, 872 S.W.2d 687, 691 (Tenn. App. 1993). Therefore, we will

not consider Bonham's arguments concerning this issue.

Accordingly, the order of the trial court is affirmed, and the case is remanded to the trial court for such further proceedings as may be necessary. Costs of appeal are assessed against the

appellant.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**


_____
**ALAN E. HIGHERS, JUDGE**


_____
**DAVID R. FARMER, JUDGE**