IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 27, 2005 Session

RICHARD D. VATT, ET AL. v. A.L. JAMES D/B/A A.L. JAMES
CONSTRUCTION COMPANY

Appeal from the Circuit Court for Hamilton County
No. 01C369     Jacqueline E. Schulten, Judge

No. E2004-00785-COA-R3-CV - FILED FEBRUARY 28, 2005

This case involves the alleged breach of a real estate sales contract. The plaintiffs argue that the defendant home builder is in breach of contract because he refused to sell them the house contracted for unless, in addition to the price stated in the contract, they paid him for costs attributed to changes in construction. None of these changes were implemented pursuant to written change orders as required under the contract. The builder countersued arguing that the changes for which he sought payment were agreed to orally after the contract was executed, that the written change order requirement of the contract was waived, and that the plaintiffs breached the contract by refusing to pay him the original contract price, plus the amount attributed to the changes. The trial court entered judgment in favor of the defendant. We affirm in part, reverse in part and remand.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and
Reversed in Part; Cause Remanded

SHARON G. LEE, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and D. MICHAEL SWINEY, JJ., joined.

John P. Konvalinka and Mathew D. Brownfield, Chattanooga, Tennessee, for the appellants, Richard D. Vatt and Sharon Vatt.

Steven M. Jacoway, Chattanooga, Tennessee, for the appellee, A.L. James d/b/a A.L. James Construction Company.

OPINION

On December 14, 1999, the appellants, Richard and Sharon Vatt, and the appellee, A.L. James d/b/a A.L. James Construction Company (hereinafter " Mr. James") entered into a real estate sales agreement (hereinafter "contract"). Pursuant to this contract, Mr. James agreed to build

a house for the Vatts in the Cummings Cove development in Chattanooga, Tennessee for which they agreed to pay $360,000.00 upon completion of construction. The contract provides that if the cost of the purchaser's selections differ from certain allowances stated in the contract "the net differences will be settled prior to installation or at closing according to a written agreement between the Purchasers and the Builder." The contract further provides that "[i]n addition to changes in allowances, any change to the price and specifications in this contract must be agreed to in writing by all parties before the change is implemented."

Construction of the house began in January of 2000 and concluded in August of 2000. Closing of the contract to purchase was scheduled for August 17, 2000; however, prior to closing, disputes arose between the parties regarding whether, in addition to the $360,000.00 purchase price set forth in the contract, the Vatts were obligated to pay for time and money Mr. James assertedly expended in implementing certain changes in construction which were allegedly at variance with the contract and for which there were no written change orders. With the apparent exceptions of costs related to brickwork, cabinetry and a whirlpool tub, the Vatts refused to pay the additional expenses asserted by Mr. James, contending that such were either contemplated under the contract and covered under the contract price of $360,000.00 or were not agreed to and were not implemented pursuant to written change orders as required by the contract. Ultimately, the parties were unable to reconcile their differences and the closing did not take place.

When closing of the sale to the Vatts failed, the house was re-listed for sale and, in early September of 2000, an offer to purchase the house for $399,000.00 was received. However, this sale was not completed and the house was subsequently sold to undisclosed parties for $350,000.00 in January of 2001.

On February 13, 2001, the Vatts filed a complaint against Mr. James in the Circuit Court for Hamilton County wherein they assert that he materially breached the contract based upon the allegations that construction of the house was not completed within the time allotted under the contract and upon the further allegation that Mr. James would not close the sale unless the Vatts paid, in addition to the contract price of $360,000.00, costs which he attributes to changes in the originally agreed upon prices and specifications. The complaint seeks reimbursement of earnest money in the amount of $5,000.00, $2,565.00 in rental and storage expenses allegedly incurred as a result of the breach and $2,973.54 for various items which were purchased by the Vatts and installed in the house at their request. The complaint also requests that the Vatts be awarded reasonable attorney's fees and expenses.

On March 26, 2001, Mr. James filed his answer and counter-complaint denying that the house was not completed on time and averring that the changes at issue were implemented at the request of the Vatts during the course of construction. The counter-complaint further avers that the Vatts wrongfully refused to pay for these changes and refused to purchase the house and that, pursuant to Mr. James' best efforts, the house was subsequently sold for $350,00.00. Mr. James asserts that, as a result of their breach of the contract, the Vatts are liable for damages, the earnest

money deposit, lost profit and additional interest and costs associated with the loan utilized by him to construct the house. The counter-complaint also requests attorney's fees and expenses.

By order of the trial court, the case was referred to the clerk and master of the Circuit Court before whom the parties presented evidence and argument. On October 13, 2003, the clerk and master entered its report to the trial court which includes the following findings and conclusions:

> **1.3** After execution of the Agreement and during the construction stage, the Vatts orally requested that James make several changes to the original plans. Per their requests, James complied and made the changes. Specifically, a more expensive brick was used; a more expensive pedestal sink in the powder room was installed; the dirt foundation for the pool was graded and then raised in elevation; the retainer wall was enlarged; additional carpentry work was done in the basement; insulation, electrical and HVAC services were added to the basement; an attic fan was installed; electrical wiring was installed in the pool area; a more expensive whirlpool tub was installed; a wooden deck was built; and additional plumbing for an icemaker was installed in the laundry room. James charged $16,432.23 for these changes that included a $6,500.00 builder's discount.
>
> ...
>
> **1.10** The parties by their conduct waived the Agreement's requirements that changes in price, specifications, or allowances be done in writing. Throughout the course of construction, the Vatts orally requested changes and James complied with such changes, even though none were reduced to writing signed by both parties. The Vatts knew James was doing extra work. While there may have been some disagreement about price, the Vatts accepted the benefits of the work without hesitation. In fact, the Vatts "approved" most of the extra work, although they later insisted they did so believing they would not be called upon to pay for such work.
>
> **1.11** Because the Vatts essentially "approved" the extra work, they breached the Agreement refusing to go forward with the closing on 17 August 2000, and pay the additional amount requested by James that reflected the original contract price plus an amount to cover extra work.

The clerk and master determined that the fair market value of the house at the time of breach was $379,475.79. Based upon the finding that the Vatts breached the contract, the clerk and master concluded that Mr. James should be awarded the $19,475.79 difference between the contract price and the amount determined to be market value. It was further determined that Mr. James should receive consequential damages for utility charges paid on the house from the time of breach until the house sold and his reasonable attorney's fees. The report provides that the Vatts should not receive a credit against damages for the earnest money being held in escrow and that this money should be

-3-

released to Mr. James. The report also denies the Vatts a credit for the $2,973.54 paid by the Vatts for items installed in the house.

Both Mr. James and the Vatts filed objections to the report of the clerk and master. Upon review of the report, the trial court entered its judgment adopting the report in its entirety with the exceptions that the Vatts should receive a credit for the $2,973.54 paid by them for installed items and that damages for breach of the contract should be "the difference between the fair market value of the house in August of 2000, which amount the Court finds to be $379,475.79 and the subsequent sale of the house in January 2001 for $350,000.00, which net amount equals is $29, 475.79." The judgment awards Mr. James attorney's fees and expenses in the amount of $8,817.70 and provides that the $5,000.00 earnest money to be released to him be credited against the total judgment amount. Both the Vatts and Mr. James appeal this judgment.

Although various issues are presented in this appeal, the sole issue we address is whether either the Vatts or Mr. James was in material breach of contract. Other issues raised are pretermitted by our decision with respect to this single issue.

In a non-jury case such as this one we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.,* 984 S.W.2d 912, 915 (Tenn. 1999). The trial court's conclusions of law are accorded no presumption of correctness. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

The clerk and master's report adopted by the trial court concludes that the Vatts were in breach of contract because they refused to go forward with the closing and pay the additional amounts demanded by Mr. James even though they had previously "approved" these amounts. For the reasons stated hereinafter, we do not agree with this conclusion.

As we have noted, the contract in this case contains separate provisions governing both changes in allowances and changes in price and specifications. As to changes in allowances, the contract provides that, if the cost of certain specified allowances is different from the amounts set forth in the contract, "the net differences will be settled prior to installation or at closing according to a written agreement between the Purchasers and the Builder." The contract further provides that "[i]n addition to changes in allowances, any change to the price and specifications in this contract must be agreed to in writing by all parties before the change is implemented."

In *Moore Constr. Co., Inc. v. Clarksville Dept. of Elec.*, 707 S.W.2d 1 (Tenn. Ct. App. 1985) we acknowledged the benefit of including a written change order requirement in a contract and noted that such a provision is valid and binding under Tennessee law. We also recognized that, like other

contractual provisions, a provision which requires written change orders can be waived by the parties:

> The waiver of a written change order requirement by an owner is not always required to be in writing but may be the result of the parties' conduct on the job. Thus, it is not uncommon for courts to find that an owner has waived a written notice requirement in cases where extra work has been ordered verbally by the owner or the extra work has been performed with the owner's knowledge and without its objection.
>
> The course of dealing between the parties can also amount to a waiver where the conduct of the parties makes it clear that they did not intend to rely strictly upon a contract's written notice requirement and that adherence to such a requirement would serve no useful purpose. ... Once a party has waived the requirement with regard to a particular matter, it cannot revoke its waiver, in whole or in part at its convenience.

*Moore Constr. Co., Inc.,* 707 S.W.2d at 13.

The clerk and master's report indicates that the determination that the written change order provision of the contract was waived was based upon a finding that the Vatts orally, and without written change orders, requested that Mr. James make ten specific changes to the original plans. Mr. James asserts that these changes represent additional costs of $22,432.23, and that, after application of a builder's discount of $6,500.00 there remains a balance of $16,432.23 due and owing. In its memorandum opinion, the trial court adopts the findings of the report in this regard. Our analysis of the ten changes set forth in the report is as follows:

1) Brick - The clerk and master's report states "a more expensive brick was used." The contract includes a specific allowance for brick, to be included in the sales price of $360,000.00. The contract does not require that changes in allowances must be approved before the change is implemented or incurred but, rather, provides that, with respect to allowances, "net differences will be settled prior to installation *or at closing according to a written agreement*" between the parties. (Emphasis added) As closing never actually occurred in this case, it remains to be seen whether a written agreement would have been entered into at that time regarding the change in brick allowance. However, Mr. Vatt testifies that he never disputed that he would have to pay for the $2,500.00 cost presented for the brick overage. A letter from Mr. Vatt's attorney to Mr. James dated July 6, 2000, indicates that Mr. Vatt excepts the brick from his dispute of the additional monies requested by Mr. James, and acknowledges that he is willing to adjust the $360,000.00 contract price with respect to the "brickwork", noting that the contract makes specific allowance for the brick. In his testimony, Mr. James also admits that the Vatts never told him they would not pay for the overage on the brick allowance. We find nothing in the record which indicates that the Vatts breached the contract by refusing to pay for the requested overage on the brick.

2) Pedestal sink - The clerk and master's report states "a more expensive pedestal sink in the powder room was installed." Mr. Vatt testifies that the contract called for installation of a pedestal sink but sets forth no dollar allowance for such. He further testifies that neither he nor Mrs. Vatt requested an "upgrade" with respect to this item. Mr. James testifies that, after he "installed the sink that we normally put in", Ms. Vatt didn't want that sink and picked out another one which he then installed. Mr. James testifies that he told Ms. Vatt that "it would be an extra charge" and she did not respond, although she did not tell him not to install the sink. At closing, Mr. James assigned a cost of $200.00 to the pedestal sink installed at Ms. Vatt's request. We find no evidence which shows that Mr. James advised Ms. Vatt that the chosen sink would result in an additional charge of $200.00.

3) Ground preparation for pool - The clerk and master's report states "the dirt foundation for the pool was graded and then raised in elevation." Mr. James assigned a cost of $3,239.00 for this work. Mr. Vatt testifies that, although there is nothing in the contract or plans that so provides, before the contract was signed he and Mr. James agreed that Mr. James would perform this work as part of the contract. Mr. James testifies as follows regarding the site preparation work that was done for the pool:

A.      All we were supposed to do as far as the site prep was have it graded so they could come in and do their pool.

The Vatts kept pressuring me saying the pool man has to come in at a certain date. I said we would have it graded for him and be ready.

Apparently, he came and looked and said it has to be built up so they could put the pool in.

Q.      Now, did you tell them you would do that?

A.      Well, at some point I told them that it wasn't my deal, that the pool man should do all this work since he was being contracted out to do the pool, but he told them that I should do the dirt work since I was the contractor.

Q.      Did you agree to do the work, dirt work?

A.      Yeah. We did it. We had to move forward with the project.

Q.      Did you tell them it would cost extra?

A.      At some point we did, yes.

Q.      When you say at some point, do you know when?

A. After they kept pressuring me and we started bringing in the dirt to get it done, then we worked up a price. I didn't know what it would cost until we got started.

It appears from this testimony that Mr. James does not disagree that he was at least responsible for the grading work, although he included the grading as part of the site preparation work for which he sought additional payment at closing. While Mr. James states at "some point" the Vatts were advised that it would be extra and "we worked up a price", we find no evidence in the record showing that the Vatts agreed to pay monies over the contract price for either the grading or foundation raising. Even assuming that Mr. James was not obligated to raise the foundation under the original contract and that this was additional work he subsequently consented to, there is no evidence that the Vatts ever agreed to pay the $3,239.00 which Mr. James specifies for the work of which this was a part.

4) Retainer wall - The clerk and master's report states "the retainer wall was enlarged." Mr. James' lists this work at a cost of $3,089.00. Mr. Vatt testifies that, although not set forth in the contract, before the contract was executed Mr. James indicated that the retainer wall would be needed and Mr. Vatt contends that the cost was understood by him to be included in the contract price of $360,000.00. Mr. James testifies that the retainer wall "regarding the pool area" was not discussed pre-contract because at that point he didn't know that it would be necessary to bring in dirt to raise the pool foundation and that a retainer wall would be required. Mr. James testifies that he told the Vatts that there would be an extra charge for the retainer wall and received no response. We find no evidence that the Vatts were advised that the cost of the retainer wall would be $3,089.00 or that they agreed to that amount.

5) Work in basement - The clerk and master's report states "additional carpentry work was done in basement" and "insulation, electrical and HVAC services were added to the basement." At closing, Mr. James represented the cost of this work to be $7,820.00. Mr. Vatt testifies that the contractual plans and specifications make no reference to finishing the basement. He also testifies that there was a discussion that, in order to lower the price of construction to $360,000.00, the basement would be left unfinished except for duct work, finishing a downstairs bathroom and "[r]ough-in to include the electrical." Mr. Vatt further testifies that when he discovered that Mr. James intended to charge him extra for rough-in work in the basement he told Mr. James to stop the work. Mr. James testifies as follows with respect to the basement work:

Q. These items here on this exhibit that deals with carpentry work basement and the electrical work rough-in, insulation, HVAC rough-in and labor, can you tell the Court what discussions you had with the Vatts about this?

A. Basically, at some point I assumed that's what they wanted me to go ahead and do, rough all this in, and they were going to finish the sheetrock, the painting, floor tile and whatever it was.

-7-

Q.      When you said assumed, did you have any conversations?

A.      We had several, yes, sir.

Q.      Okay.

A.      About the downstairs, yes.

Q.      Okay.  Were there discussions about cost?

A.      No.

There was no discussion and, therefore, there was no agreement between the parties that there would be an additional charge for this work in the basement.  We further note the following cross-examination testimony of Mr. James' witness, Brian Kelly, managing broker for sales of property in the Cummings Cove development. This testimony confirms Mr. Vatt's testimony that he requested that the work stop once he realized that he would incur additional charges:

> A.      Dr. Vatt told me in front of his house, he said - - he asked Mr. James if he could finish the basement.  Mr. James said sure we can finish the basement and which that work did start.
>
> Now, once they knew that there was going to be dollars associated with it, your question is did he ask me to tell him to stop?
>
> Q.      Yes.
>
> A.      Could be and I probably told Mr. James, yeah, if he's not going to pay for it, there is no reason to do the work.
>
> Q.      That's part of the miscommunications in connection with this project, wasn't it?  Dr. Vatt asked Mr. James if he could finish the basement and he said sure and proceeded to do it and Dr. Vatt didn't think he was going to be charged for it and found out later he was going to be charged and when he found out he was going to be charged he said stop; isn't that what happened?
>
> A.      Basically in a nutshell, yes, and never agreeing up front what a price would be for a certain thing.

We find no evidence that the parties agreed to the $7,820.00 price set forth by Mr. James for this work in the basement.  We further find that Mr. Vatt requested that the work discontinue when he discovered that there would be a charge.

6) Attic fan - The clerk and master's report states "an attic fan was installed." Mr. James assigns a cost of $250.00 for this item. Mr. Vatt testifies that he never asked Mr. James to install an attic fan and that Mr. James never told him there would be an extra charge for the attic fan. Mr. James testifies that during construction Mr. Vatt told him that he wanted the fan. However, Mr. James testifies that the cost of the fan was not discussed nor do we find evidence showing that at any time the Vatts agreed to the installation of the attic fan at the additional cost of $250.00.

7) Electrical wiring in pool area - The clerk and master's report states "electrical wiring was installed in the pool area." Mr. James asserted an additional cost of $225.00 for this work. Mr. Vatt admits in his testimony that electrical preparation was necessary for the pool area and maintains that, although not in the contract, this work was discussed and agreed to by Mr. James before the contract was entered into. We are directed to no evidence in the record which specifically rebuts this testimony and find no evidence otherwise which shows that the Vatts at any time agreed to pay an additional $225.00 for the installation of electrical wiring in the pool area.

8) Whirlpool tub - The clerk and master's report states "a more expensive whirlpool tub was installed." Mr. James presents an additional cost of $1,383.75 for this item. The whirlpool tub is not mentioned in the contract. However, Mr. Vatt testifies that, prior to the execution of the contract, he presented Mr. James with a brochure regarding the whirlpool tub and that Mr. James "stated that should be no problem because his suppliers gave him a great price." Mr. Vatt avers that the specific price of the whirlpool was not discussed at that time. Mr. James does not dispute that he and the Vatts discussed a whirlpool tub prior to execution of the contract, but asserts that "all they wanted was a six foot-whirlpool tub and that's something we put in most of our homes at this price range." Subsequently, at the request of the Vatts, Mr. James installed a tub chosen by Ms. Vatt rather than the tub he had intended to install. Mr. James testifies that he advised the Vatts that there would be an extra charge for the tub they had chosen, but that he "really didn't get a true answer." We also note that, under cross examination, Mr. Vatt confirms that, prior to closing, he offered to settle the dispute regarding the whirlpool by paying the $1,383.75 demanded by Mr. James:

> Q.     And this whirlpool tub, $1,383.75, my understanding is that you agreed that that amount you would agree to pay.
>
> A.     As part of an offer of settlement.
>
> Q.     Okay. So it's just if you close for 360, I'll pay for the whirlpool tub and the brick overage, but that's just an offer of settlement. If you don't, then - -
>
> A.     The presentation in the letter that you referenced discussed paying for that as an effort to negotiate some type of means for us to be able to close on the home.

The contract did not offer an allowance. We were not presented an allowance. The whirlpool was discussed with Mr. James prior to him submitting the bid.

We find no evidence that the Vatts contracted to pay an additional $1,383.75 for the installation of the tub. Furthermore, the Vatts did not refuse to close based upon the dispute regarding the charges sought for the whirlpool tub installation, but rather offered to pay such charges as demanded in order that closing might proceed as scheduled.

9) Wooden deck - The clerk and master's report states that "a wooden deck was built." Mr. James sets forth an amount of $4,150.00 for this item. Apparently the parties agree that the original contract called for a concrete patio rather than a deck; however, it subsequently became apparent that construction of the concrete patio as envisioned by the Vatts was no longer feasible and the parties entered into discussions with respect to the construction of a deck instead. Mr. James proposed that he build a wooden deck. Mr. Vatt testifies that he was willing to consider agreeing to the construction of a synthetic deck, but never received information from Mr. James regarding what the deck would cost using synthetic materials. Mr. James testifies that at some point he proceeded to build the wooden deck in order to complete the house by the scheduled closing date. Upon being notified of Mr. James intent to proceed, the Vatts wrote him a letter dated July 10, 2000, which states in part as follows:

> Our desire for a concrete back patio has not changed. It was the Builder who suggested a wooden deck. At the time you suggested a wooden deck, you did not mention any additional charge. We restated our expectation was a concrete patio. We also said we might be willing to consider a deck but did not like pressure treated wood surfaces. You mentioned a synthetic decking material was available and stated you would provide us with a sample. We have waited two months for the Builder to supply us with a sample of the synthetic material, which has not yet been provided despite multiple requests.
> ...
>
> The original expectation of a back patio made of an appropriate concrete surface has been discussed with you on multiple occasions. We do not agree to the terms of the addendum related to the substitution of a wooden deck. An appropriate back patio is required by the building code. It is unknown what plans you have submitted to the architecture review committee, but such committee approval is required. Therefore, *should the Builder proceed with the proposed deck addendum, the Builder will remain responsible for any and all expenses.* (Emphasis added)

We find no evidence that the Vatts agreed to pay an additional $4,150.00 for construction of the wooden deck. On the contrary, the Vatts specifically advised Mr. James that if he proceeded to construct the wooden deck it would be at his expense and not theirs.

-10-

10) Plumbing for ice maker - The clerk and masters report states that there was "additional plumbing for an ice maker." Mr. James places the cost of this item at $75.00. Mr. Vatt testifies that the plumbing for the ice maker was discussed and agreed to before the contract was signed and was included in the contract price. Mr. James testifies that the additional plumbing for the ice maker was requested by Mrs. Vatt after the contract was executed; however, Mr. James admits that the parties did not discuss cost and we find no evidence that the Vatts agreed to pay an additional $75.00 for this item.

In *Jane Doe, et al. v. HCA Health Services of Tennessee, Inc., d/b/a HCA Donelson Hospital*, 46 S.W.3d 191, 196 (Tenn. 2001), the Tennessee Supreme Court discussed elements essential to the formation of an enforceable contract as follows:

> A contract " 'must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced.' " *Higgins v. Oil, Chem., and Atomic Workers Int'l Union, Local #3-677,* 811 S.W.2d 875, 879 (Tenn.1991) (quoting *Johnson v. Central Nat'l Ins. Co. of Omaha*, 210 Tenn. 24, 34-35, 356 S.W.2d 277, 281 (Tenn. 1962) (citations omitted)). Indefiniteness regarding an essential element of a contract "may prevent the creation of an enforceable contract." *Jamestowne On Signal, Inc. v. First Fed. Sav. & Loan Ass'n,* 807 S.W.2d 559, 565 (Tenn. Ct. App. 1990) (citing *Hansen v. Snell*, 11 Utah 2d 64, 354 P.2d 1070 (1960)). A contract " 'must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties.' " *Higgins,* 811 S.W.2d at 880 (quoting *Soar v. National Football League Players' Ass'n,* 550 F2d 1287, 1290 (1st Cir. 1977); *see also Restatement (Second) of Contracts* § 33(2) (1981) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.")

> Two of the leading treatises on contract law provide additional authority concerning the requirement of definite contractual terms. "Certainty with respect to promises does not have to be apparent from the promise itself, so long as the promise contains a reference to some document, transaction or other extrinsic facts from which its meaning may be made clear." 1 Richard A. Lord, *Williston on Contracts*, § 4:27, at 593 (4th ed. 1990). In addition, as stated in 1 Joseph M. Perillo, *Corbin on Contracts*, § 4.3, at 567-68 (Rev. ed. 1993):

> If the parties provide a practicable method for determining [the] price or compensation there is no such indefiniteness or uncertainty as will prevent the agreement from being an enforceable contract. The same is true if they agree upon payment of a "reasonable" price or compensation. There are cases, however, in which it is clear that the parties have not expressly or implicitly agreed upon a "reasonable price," and also have not prescribed

a practicable method of determination. Where this is true, the agreement is too indefinite and uncertain for enforcement.

Based upon our careful analysis of the evidence with respect to each of the matters for which Mr. James seeks additional payment, we are compelled to the conclusion that there was not "a meeting of the minds of the parties in mutual assent to the terms" at issue. Our reasons for this conclusion, as set forth above, are varied. However, with respect to all of the items listed, we find that the parties "have not expressly or implicitly agreed upon a reasonable price nor have they agreed upon a practicable method of determination of price and, accordingly we hold that any agreement Mr. James alleges the parties had that they would pay for these charges over and above the original contract price of $360,000.00 is unenforceable. We further hold that by refusing to sell the Vatts the house unless they pay the asserted additional charges Mr. James materially breached the contract which provides that he sell them the house for $360,000.00. Accordingly, the Vatts are entitled to a refund of the $5,000.00 earnest money deposit which currently remains in escrow. The Vatts are further awarded reasonable attorney's fees and court costs pursuant to that provision of the contract which states:

> In the event of the default of either party hereto, and litigation ensues, a reasonable attorney's fee shall be included in the damages of the non-defaulting party, recoverable together with court costs.

The Vatts' request for rental and storage expenses in the amount of $2,565.00, as set forth in their original complaint, is denied because we do not find that it has been shown that such damages were within the reasonable contemplation of all the parties at the time the contract was entered into. *Turner v. Benson*, 672 S.W.2d 752, 755 (Tenn. 1984).

For the reasons stated herein the judgment of the trial court is affirmed to the extent that it decrees that the Vatts be reimbursed $2,973.54 for items purchased by them that were installed in the house. Otherwise, the judgment of the trial court is reversed and the cause is remanded for further action consistent with this opinion. Costs of appeal are adjudged against A.L. James d/b/a A.L James Construction Company.

_____
SHARON G. LEE, JUDGE